# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

PHILLIP C. RUEHL and
PC RUEHL ENGINEERING, INC.,

         Plaintiffs,

      v.                       Case No.: 3:14-CV-317-JVB-JEM

AM GENERAL, LLC,

         Defendant.

## OPINION AND ORDER

This case is about rights to a patent related to vehicular frame rails. The parties agree Ruehl[1] conceived the invention, but they disagree about who owns it given the contracts between them.

Both sides move for partial summary judgment.

### A.      Facts

When considering AM General's motion the Court views the facts in the light most favorable to Ruehl, and when considering Ruehl's motion the Court views the facts in the light most favorable to AM General. The Court does not weigh the evidence or determine the truth regarding the facts.

---

[1] Unless otherwise noted, this Order will refer to Plaintiffs Phillip Ruehl and PC Ruehl Engineering, Inc., collectively as "Ruehl."

1. **Mother Necessity**

The parties agree Ralf Pionke of AM General contacted his former co-worker Philip Ruehl in late 2004 or early 2005 about consulting with AM General on a project to upgrade the frame rails for its Humvee line of trucks.

Mr. Pionke sent Mr. Ruehl drawings of the then-current side rail design on February 17, 2015 (via email), and on February 23, 2005 (via UPS). AM General claims Mr. Ruehl admitted that once he had its print drawings, which he did not receive until February 25, 2005, he looked at them and wanted to modify the spacers.[2]

2. **February purchase order**

Mr. Ruehl signed a purchase order on February 26, 2005. The front of this purchase order says: "This purchase order is issued to cover cost to provide engineering support for HMMWV frame rail feasibility study." (Feb. Purchase Order, DE 51-13 at 2.) It also caps the cost at $22,500. (*Id.*) It warns: "ACCEPTANCE OF THIS ORDER CONSTITUTES AN ACCEPTANCE OF THE TERMS AND CONDITIONS ON FACE AND REVERSE HEREOF." (*Id.*)

The back of this purchase order says:

> 1. This order constitutes the entire agreement between the parties hereto and the terms and conditions set forth herein cannot be modified or amended without the written consent of the Purchaser. No officer, employee or other representative of Purchaser is authorized to make any oral contract of commitment for the purchase of materials or to modify or change the terms and conditions of this order unless such modification or change is in writing approved by Vice President of the Purchaser.

---

[2] AM General cites page 40, lines 9 through 17, of Mr. Ruehl's deposition (Ruehl Dep., DE 51-11 at 8). But this portion of the deposition does not definitively support AM General's claim of admission.

* * *

5. It is understood and agreed the Seller warrants that the sale or use of the material covered by this order, either alone or in combination with other materials, will not infringe or contribute to the infringement of any patents, either in the U.S.A. or in foreign countries, and that the Seller covenants to defend every suit which shall be brought against the Purchaser or any party selling or using any of the Purchaser's products for any alleged infringement of any patent by reason of the sales or use of said materials, either alone, or in combination with other materials, and to pay all expenses and fees of counsel which shall be incurred in and about defending, and all cost, damages and profits recoverable in every such suit.

* * *

9. Information, including but not limited to technical information, drawing and data, submitted any time by Seller to Purchaser relating to goods or services covered by this purchase order are deemed not to be submitted in confidence unless otherwise specifically agreed to in writing. Any restrictive markings affixed upon any such information furnished to Purchaser shall be of no force or effect, may be modified, removed or ignored by Purchaser without any liability to Seller and the information may be used by Purchaser in any way in the conduct of its business. Seller's sole rights with respect to use of such information by Purchaser, it's [sic] successors, subsidiaries, licenses, affiliates or parents shall be determined only by valid pre-existing patent rights of Seller as related to the manufacture, use or sale of goods or services covered by this order. Seller agrees to promptly notify Purchaser of any pre-existing patents of any other form of protection which Seller may hold or know of which relates to the goods or services to be provided under this purchase order. In connection with the development of any ideas, inventions, improvement or discoveries, including all related information and know-how, related to the goods or services to be provided under this purchase order and for which Purchaser has provided or is to provide support to Seller in the form of funding, including but not limited to payments in whole or part for prototype components or tooling, designing, testing or consulting, Purchaser shall automatically be entitled to and Seller agrees to and hereby assigns all rights, title and interest to such ideas, inventions, improvements and discoveries (unless otherwise specifically agreed to in writing and such event Purchaser shall be entitled to at least a nonexclusive paid up, irrevocable worldwide right and license including the right to fully sublicense third parties including the U.S. Government for all Governmental purposes to practice and have practiced for its purpose such

3

invention). Seller agrees to promptly notify Purchaser in writing of any such idea, invention, improvement or discovery so developed. The provisions of this clause shall survive termination of fulfillment of this order and shall incur to the benefit of Purchaser's successors, subsidiaries, licensees, affiliates of parents.

(Feb. Purchase Order, DE 51-13 at 3.[3]) Mr. Ruehl acknowledges that his signature on this document commits him to its terms.

### 3. Original concept sketch: March 5, 2005

On March 5, 2005, Mr. Ruehl sketched the big idea at the heart of this case. But the parties disagree about the genesis of this idea.

Mr. Ruehl claims in his amended complaint he conceived the idea before signing the purchase order on February 26, 2005. But he testified on November 19, 2015: "The iterative process of inventing the concept was completed on March 5, 2005." (Ruehl Dep., DE 51-11 at 15.) And on April 14, 2016, Mr. Ruehl signed his declaration stating: "None of my invoices to AM General included charges for my work inventing my new frame rail concept, which was completed no later than March 5, 2005 (and, to my best recollection, earlier than that.)" (Ruehl Decl., DE 55-3 at 2.)

AM General argues there is no evidence Ruehl conceived the idea before signing the February purchase order other than his say-so. AM General argues the evidence demonstrates that the spacer concept was not completed until March 5, 2005, and that the idea continued to develop after that date: "[T]he undisputed evidence demonstrates that Ruehl, after reviewing AMG's frame rail drawings and signing the February PO, came up

---

[3] Some apparent instances of the word "of" might actually be "or," and vice versa. The document is difficult to read in places.

with a spacer concept and then spent three weeks further refining and developing this concept as part of the engineering support he provided to AMG." (AM General's Br. Opp'n Pl.'s Mot. Partial Summ. J., DE 60 at 20.)

Not only do the parties disagree about the genesis of the idea, they also disagree about what happened to the idea after Ruehl sketched it on March 5, 2005. Ruehl claims the idea never changed or developed after that date, or perhaps even for some time before. Ruehl claims no one refined, tested, supported, or funded the idea after that date, or perhaps even for some time before. AM General, however, argues that the idea was subject to continued development, refinement, and testing during the following months.

The parties refer to the idea in various ways. Ruehl refers to it as an invention "comprised of a box-type frame rail assembly," and as "a much improved means of assembling frame rails." (Am. Compl., DE 22 at 4, 6.) He says the patent, entitled "Boxed Frame Member and Method for Manufacture," covers the invention. (*Id.* at 7.)

AM General refers to the idea as a "spacer concept." (AM General's Br. Supp. Mot. Partial Summ. J., DE 51 at 5.) AM General denies the amended complaint's detailed definition of the invention is accurate, but admits the patent relates to the new frame rail design. Mr. Ruehl also refers to the idea as "my spacer concept" in correspondence. (Email, Dec. 1, 2005, DE 52-7 at 3.) For the sake of simplicity, the Court will use "idea" to reference the contested intellectual property.

On March 5, 2005, Mr. Ruehl showed the sketch of the idea to Werner Kraenzler, a prototype shop owner, who confirmed he believed he could make a prototype of the idea. Mr. Ruehl did not identify the idea as confidential.

**4.      "Kick-off" meeting: March 7, 2005**

On March 7, 2005, Ruehl met with representatives of Applied Technologies, Inc., and Mr. Pionke at AM General's facility in Livonia, Michigan. Ruehl claims he showed the ATI representatives his sketch of the idea before Mr. Pionke even entered the room.

At that meeting, after disclosing his idea to the ATI representatives and to Mr. Pionke, Ruehl signed a confidentiality agreement presented to him by AM General. R.J. Gula, a vice president of AM General, signed it the next day.


**5.      Confidentiality agreement: March 7, 2005**

The confidentiality agreement states:

> 1. "Confidential Information" shall mean any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to all of the Disclosing Party's trade secrets, designs, specifications, ideas, concepts, plans, formulas, patterns, devices, software, drawings, machinery and equipment, products, processes, procedures, methods, applications, technologies, financial information, customer information (including identity, specific needs and any of such customer's information possessed by the Disclosing Party) or any compilation or combination of the foregoing that is disclosed to Receiving Party and marked as confidential or proprietary. Any information that is transmitted orally shall be considered to be Confidential Information, provided such information is identified as proprietary or confidential at the time of such oral transmittal and notice is subsequently provided in writing of its confidential or proprietary nature by Disclosing Party and transmitted to Receiving Party within ten (10) days of such oral transmission. Any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to Commercial/Military Vehicle Frame Feasibility Study

> 2. Information of the Disclosing Party shall not be considered "Confidential Information" if it:
> > (a) Is publicly known to the Receiving party at the time of disclosure;

(b) Becomes public knowledge without breach of this Agreement by Receiving Party;

(c) Is known to Receiving Party at the time of the disclosure and is not subject to any restriction that would be violated by its disclosure;

(d) Is lawfully obtained, without restriction that would be violated by the disclosure by Receiving Party, from a third party not affiliated with Disclosing Party; or

(e) Is independently developed by Receiving Party by employees of Receiving Party who have not had access to the Confidential Information or by third parties unrelated to Disclosing Party.

* * *

11. Nothing contained in this Agreement shall be construed as granting or conferring to Receiving Party any patent rights or licenses from Disclosing Party either expressly or by implication.

* * *

15. This Agreement reflects the entire agreement of Company and AMG with respect to the subject matter hereof and supersedes all prior oral and written representations, warranties, covenants, commitments, guarantees, and other agreements about the same subject matter hereof.

* * *

20. This Agreement shall be governed by and construed in accordance with the laws of Indiana without reference to conflicts of law principles, and the parties agree to be subject to the jurisdiction of the courts of Indiana. Any legal action to enforce this Agreement shall be brought in St. Joseph County, Indiana.

(Mutual Confidentiality Agreement, DE 22-1 at 1–3.)

## 6.    Frame rail feasibility study

After the meeting on March 7, 2005, Ruehl worked with AM General and ATI on the frame rail feasibility study. The parties disagree about whether this work included work on the idea itself.

On March 24, 2005, Ruehl completed a report summarizing his work. He identified the spacer concept as a "key feature" of his proposed redesigned frame rails. He did not mark the report, or anything included in the report, as confidential.

On March 28, 2005, he emailed Mr. Pionke drawings, including a drawing of the spacer concept. Ruehl did not mark the drawing as confidential.

**7.      Invoices**

Mr. Ruehl billed AM General for his work via two invoices dated March 29, 2005. The first invoice itemizes travel expenses with precision, and totals $2,699.58. (Invoice # 120, DE 51-2 at 2.) The first three items on the list bill for travel on March 6, 2005.

The second invoice does not specify the dates it covers, nor does it itemize the work for which Ruehl billed. The second invoice indicates he chose not to bill for 3.5 days of work, as a "Professional Courtesy." (Invoice # 121, DE 51-3 at 2.) In an email to Mr. Pionke dated March 30, 2005, Mr. Ruehl apparently explained that he reduced the bill to keep it under the budget of $22,500: "I have adjusted billing to remain within budget; but we have exhausted the allocated funds." (Email, Mar. 30, 2005, DE 51-9 at 2.) In an attachment to another email, he apparently sheds further light on the bill: "I pondered the problem for weeks with nothing to show. The problem is as old as the industry. I could not consider billing for such 'dreaming', with high probability of failure -- in 100 years the problem had not been solved." (Email, Dec. 1, 2005, DE 52-7 at 4.) The second invoice seeks $19,800.

The combined total of these two invoices is $22,499.58. AM General paid this amount to Ruehl. Ruehl claims the invoices did not include any time spent conceiving the invention.[4]

8.    **April purchase order**

On April 21, 2005, AM General sent Ruehl a second purchase order for "ENGINEERING SUPPORT OF FRAME RAIL REVIEW." (Apr. Purchase Order, DE 51-16 at 2.) The April purchase order and the February purchase order carry the same terms on their backs. Ruehl signed the April purchase order on April 24, 2005.

Again, the parties dispute the nature of the work Ruehl performed under the April purchase order. AM General claims Ruehl took an active role in evaluating the spacer concept and was instrumental in arranging meetings between AM General and the prototype shop to produce prototype rails incorporating the spacer concept. AM General claims his work included development of the idea itself. Ruehl denies this, and instead claims that the idea itself did not change or develop during this time period.

Pursuant to an invoice following the April purchase order, AM General paid Ruehl an additional $15,027.93.

---

[4] Invoice # 121, dated March 29, 2005, seems to bill for 20 days of work at $1,200 per day and seems to deduct 3.5 days for "Professional Courtesy." (Invoice # 121, DE 51-3 at 2.) There are not many days between March 5, 2005, when the idea *might* have been completed and March 29, 2005, the date of the invoice. March 29 minus 20 days is about March 9. Did Ruehl work full days and almost all weekends during this period? Maybe. And what precise work did Ruehl do under the heading "Professional Services"? These are the sorts of factual issues the Court cannot resolve at this stage.

**9.     Patent**

AM General claims that in the fall of 2005, after it had spent money in both phases to have the spacer concept developed, defined, tested, and prototyped, AM General concluded that the spacer concept Ruehl developed for it was patentable. Ruehl argues AM General did not fund the spacer concept itself, but only funded its application to AM General's needs.

On November 1, 2005, Ruehl filed a patent application. On November 7, 2005, Ruehl requested for the first time that AM General pay him royalties for using the spacer concept.

On February 1, 2006, AM General filed its own patent application. AM General listed Ruehl as the sole inventor, and listed itself as the sole owner.

On July 16, 2013, the United States Patent and Trademark Office issued to Ruehl a patent covering the idea. This patent, called "Boxed Frame Member and Method for Manufacture," embodies the spacer concept.


**B.     Claims and procedural posture**

Ruehl claims AM General used and continues to use his idea without paying for it, in violation of the patent and the confidentiality agreement. Ruehl brings a claim for patent infringement and a claim for breach of contract.

AM General brings counter-claims. It seeks a declaratory judgment that it owns all right, title, and interest in and to the new frame rail design and all related inventions, patent rights, and other intellectual property, or, alternatively that it has at least a nonexclusive, paid up,

irrevocable, worldwide right and license, by virtue of the purchase orders. AM General further seeks a declaratory judgment that it has not infringed the patent, because it has ownership or license rights over it. AM General also brings a counter-claim for breach of contract, alleging Ruehl breached the confidentiality agreement by applying for a patent using confidential information Ruehl received from AM General, and also using confidential information belonging to AM General pursuant to the purchase orders. Finally, AM General brings a counter-claim for breach of warranty and indemnification on the basis of the purchase orders.

The parties traded motions for partial summary judgment.

AM General seeks summary judgment in its favor on both of Ruehl's claims and on its own declaratory judgment and warranty counter-claims. AM General argues that Ruehl contractually assigned to it all rights to the idea; that if neither the assignment nor license are effective then Ruehl breached the warranty in the purchase orders; and that the confidentiality agreement does not apply to the information Ruehl claims was confidential.

Ruehl also seeks summary judgment on the issues of ownership and confidentiality. Ruehl argues that the purchase orders did not transfer any rights over the idea to AM General and that the confidentiality agreement protects Ruehl's rights over the idea.

## C.    Summary judgment standard

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving party and draw all

legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**D.     Discussion**

AM General proposes a simple resolution to this case: The February purchase order transferred ownership of the idea to it, and then the confidentiality agreement executed on March 7, 2005, did nothing to alter that transfer. So, the argument goes, AM General owns the idea and is therefore not susceptible to any claims that it infringed the patent it owns or that it breached confidentiality regarding the idea it owns.

Ruehl, however, proposes an equally simple resolution: Neither purchase order transferred any rights over the idea to AM General because AM General did not satisfy the

funding clause. Moreover, the confidentiality agreement ensured Ruehl retained all rights over confidential information he submitted to AM General.

This case hinges not only on contract interpretation, but also on genuine issues of material fact.[5]

**1.      Law controlling contract interpretation**

This case involves three contracts. Regarding the two purchase orders, the Federal Circuit held that "[c]onstruction of patent assignment agreements is a matter of state contract law." *Euclid Chem. Co. v. Vector Corrosion Techs*, 561 F.3d 1340, 1343 (Fed.Cir. 2009). So the Court will apply state law to determine whether the purchase orders assigned any rights in the patent to AM General.

Regarding the confidentiality agreement, federal courts in federal question cases apply state substantive law to supplemental state law claims. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). So the Court will apply state law to determine whether AM General breached the confidentiality agreement.

Here, the purchase orders contain no choice-of-law clause, the parties agreed Indiana law would govern the confidentiality agreement, the parties' summary judgment briefs rely heavily

---

[5] "The first thing we do, let's kill all the lawyers." William Shakespeare, *The Second Part of King Henry the Sixth*, act 4, sc. 2. People often misattribute this phrase to Shakespeare. Actually Dick the Butcher, a murderous rebel, says it. The point is that lawyers are good, and stand against tyranny. The murderous rebel wants them out of the way. Perhaps one source of the dilemmas in this case is not the involvement of too many lawyers, but the involvement of too few. Had more lawyers revised the contracts at issue, they might have caused less problems. Had more lawyers advised the parties at the inception of their relationship, they might have had less problems. After all, the briefing filed by the lawyers in this case is, by and large, very good.

13

on Indiana law, and Indiana is the forum state. No parties dispute the applicability of Indiana law to the interpretation of the three contracts.

In Indiana, the law of contract construction is generally well settled. *See W. & S. Life Ins. Co. v. Vale*, 12 N.E.2d 350, 354 (Ind. 1938); *see also First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 603–04 (Ind. 1990).

The ultimate goal of contract interpretation is to ascertain the intent of the parties at the time they made the agreement. *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012). A court should "begin with the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Id.* Indiana follows the "four corners rule": extrinsic evidence is inadmissible to add to, vary, or explain the terms of a written contract if the terms are clear and unambiguous. *Roberts v. Cmty Hosps. of Ind.*, 897 N.E.2d 458, 467 (Ind. 2008).

A court should give a contract's language its plain and ordinary meaning, unless the contract uses a particular term in a manner intended to convey a specific technical concept. *Citizens Action Coal. of Ind. v. Duke Energy Ind.*, 44 N.E.3d 98, 108 (Ind. Ct. App. 2015). A court should construe a contract "in a way that gives each term independent meaning, rather than rendering one surplusage." *Pohl v. Pohl*, 15 N.E.3d 1006, 1014 (Ind. 2014).

Conditions precedent are generally disfavored, and must be explicitly stated in the contract. *Sasso v. Carsaw Orthopedic*, 45 N.E.3d 835, 840 (Ind. Ct. App. 2015).

A contract is ambiguous only if reasonable persons could disagree about its interpretation; and if the ambiguity is in the contractual language, its interpretation remains a

question of law. *See Estate of Williams v. S. Indiana Gas & Elec. Co.*, 551 F. Supp. 2d 751, 758 (S.D. Ind. 2008). Finally, if a contract is ultimately ambiguous, it should be construed against its drafter. *MPACT Const. Group v. Superior Concrete Constructors*, 802 N.E.2d 901, 910 (Ind. 2004).

**2.      February purchase order**

AM General claims the February purchase order transferred to it all rights over the idea. AM General focuses on the latter portion of paragraph 9:

> In connection with the development of any ideas, inventions, improvement or discoveries, including all related information and know-how, *related to the goods or services to be provided under this purchase order* **and** *for which Purchaser has provided or is to provide support to Seller in the form of funding*, including but not limited to payments in whole or part for prototype components or tooling, designing, testing or consulting, Purchaser shall automatically be entitled to and Seller agrees to and hereby assigns all rights, title and interest to such ideas, inventions, improvements and discoveries (unless otherwise specifically agreed to in writing and such event Purchaser shall be entitled to at least a nonexclusive paid up, irrevocable worldwide right and license including the right to fully sublicense third parties including the U.S. Government for all Governmental purposes to practice and have practiced for its purpose such invention).

(Feb. Purchase Order, DE 51-13 at 3 (emphasis added).)

AM General urges the Court to interpret the phrase "and for which Purchaser has provided or is to provide support to Seller in the form of funding" as modifying the phrase "goods or services to be provided under this purchase order," rather than as modifying the phrase "the development of any ideas, inventions, improvement or discoveries." AM General asserts that grammar requires such an interpretation, but does not point to any clear and dispositive grammatical rule.

The Court disagrees. A compelling key to this interpretation is the word "and" in the middle of the phrase "related to the goods or services to be provided under this purchase order **and** for which Purchaser has provided or is to provide support to Seller in the form of funding." If the word "and" disappeared, then the "support" clause would apply only to the phrase "goods or services to be provided under this purchase order."

For "and" here to have meaning, and not be mere surplusage, "and" must mean that the "support" clause reaches back and applies to the phrase "development of any ideas, inventions, improvement or discoveries."

This interpretation also makes better sense of the "support" clause. As Ruehl notes, the entire purchase order concerns and assumes payment by AM General for goods or services to be provided under this purchase order. The "support" clause would be redundant and strange, even mere surplusage itself, if it only referred to "goods or services to be provided under this purchase order."

The better interpretation of this portion of paragraph 9 of the purchase order is the one advanced by Ruehl. For Ruehl to assign all rights, title, and interest over his idea to AM General, two requirements must obtain: (1) the idea must be "related to the goods or services to be provided under this purchase order"; and (2) AM General "provided or is to provide support to Seller in the form of funding" for "the development of any ideas, inventions, improvement or discoveries."

But despite this interpretation of the purchase order, a genuine issue of material fact precludes summary judgment: Did AM General satisfy the second requirement for transfer of ownership even under Ruehl's interpretation of the contract?

Ruehl insists AM General provided no support for the development of the idea itself. But AM General insists it did. Ruehl signed the first purchase order on February 26, 2005. The earliest extant drawing of the idea on record is dated March 5, 2005, after Ruehl signed the first purchase order. This suggests the possibility that Ruehl conceived of or developed or refined the idea itself after signing the first purchase order, and while under its terms, and during a period of work for which AM General provided or at least *was to provide* support in the form of funding. The invoice Ruehl sent following the February purchase order further muddies these factual issues because it fails to itemize the dates or hours or precise nature of the work for which Ruehl billed. Indeed, the budget for the first purchase order was $22,500. Ruehl billed $22,499.58.

Ruehl argues that the execution of the confidentiality agreement was a condition precedent to the parties' rights and obligations under the purchase order. But the February purchase order says nothing about depending on execution of another document before becoming effective. In fact, the February purchase order says it "constitutes the entire agreement between the parties." (Feb. Purchase Order, DE 51-13 at 3.) Moreover, Ruehl did not even know when he signed the February purchase order that AM General would later expect him also to sign the confidentiality agreement. The February purchase order can't be subject to a condition precedent of the execution of the confidentiality agreement when the first document doesn't say anything about the second, the first document has an integration clause, and Ruehl didn't even know of the second document when he signed the first.

In addition, AM General argues that it provided funding to support the idea or its development throughout the further iterative process, including payments to ATI to test the idea

and payments to Assured Design to develop prototype frame rails using the spacer and the manufacturing process.

In sum, there are genuine issues of material fact regarding whether AM General provided funding to support the idea or its development, and related genuine issues of material fact regarding the timing, process, and progress of the idea from its conception, through its development, to its completion.[6] Viewing the facts in the light most favorable to the non-moving party regarding each motion for partial summary judgment, the Court cannot conclude at this stage that either moving party is entitled to judgment as a matter of law.

The Court notes the parties barely briefed the first portion of paragraph 9 of the purchase order:

> 9. Information, including but not limited to technical information, drawing and data, submitted any time by Seller to Purchaser relating to goods or services covered by this purchase order are deemed not to be submitted in confidence unless otherwise specifically agreed to in writing. Any restrictive markings affixed upon any such information furnished to Purchaser shall be of no force or effect, may be modified, removed or ignored by Purchaser without any liability to Seller and the information may be used by Purchaser in any way in the conduct of its business. Seller's sole rights with respect to use of such information by Purchaser, it's [sic] successors, subsidiaries, licenses, affiliates or parents shall be determined only by valid pre-existing patent rights of Seller as related to the manufacture, use or sale of goods or services covered by this order. Seller agrees to promptly notify Purchaser of any pre-existing patents of [or?] any other form of protection which Seller may hold or know of which relates to the goods or services to be provided under this purchase order.

---

[6] The parties did not fully address the issue of whether the "support" clause applies only to "ideas, invention, improvement or discoveries, including all related information and know-how," or whether the "support" clause applies only to "the development of any ideas, inventions, improvement or discoveries, including all related information and know-how." This may be a distinction without a difference. At this stage, the Court sees no basis to parse this further. The Court sees no reason why "development" cannot include conception and further development all the way through completion.

(Feb. Purchase Order, DE 51-13 at 3.) The Court encourages the parties to address this portion of the purchase order more fully in any appropriate future briefs.

**3.      Confidentiality agreement**

Ruehl insists the confidentiality agreement protects his idea. AM General, however, argues the confidentiality agreement never even applied to the idea.

As in the February protective order, the relevant contractual language in the confidentiality agreement presents two modifying clauses separated by the word "and" but by no commas:

> 1. "Confidential Information" shall mean any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to all of the Disclosing Party's trade secrets, designs, specifications, ideas, concepts, plans, formulas, patterns, devices, software, drawings, machinery and equipment, products, processes, procedures, methods, applications, technologies, financial information, customer information (including identity, specific needs and any of such customer's information possessed by the Disclosing Party) or any compilation or combination of the foregoing that is *disclosed to Receiving Party* **and** *marked as confidential or proprietary*. Any information that is transmitted orally shall be considered to be Confidential Information, provided such information is identified as proprietary or confidential at the time of such oral transmittal and notice is subsequently provided in writing of its confidential or proprietary nature by Disclosing Party and transmitted to Receiving Party within ten (10) days of such oral transmission. Any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to Commercial/Military Vehicle Frame Feasibility Study

(Mutual Confidentiality Agreement, DE 22-1 at 1 (emphasis added).)

Now the parties arguably swap their interpretative lenses. Ruehl interprets the "marked as confidential or proprietary" clause as modifying only the phrase "any compilation or

19

combination of the foregoing." AM General interprets the "marked" clause as applying more broadly to "any information."

The Court interprets the structure of the language in paragraph 1 of the confidentiality agreement consistently with its interpretation of the language of paragraph 9 of the protective order. Both phrases involve the use of "and" without commas:

- "related to the goods or services to be provided under this purchase order and for which Purchaser has provided or is to provide support to Seller in the form of funding" (Feb. Purchase Order ¶ 9, DE 51-13 at 3);

- "that is disclosed to Receiving Party and marked as confidential or proprietary" (Mutual Confidentiality Agreement ¶ 1, DE 22-1 at 1).

Similarly to its conclusion regarding the purchase orders, the Court concludes that the "marking" clause applies broadly to the phrase "any information" in the first line of paragraph 1.

Moreover, the clause "that is disclosed to Receiving Party" is parallel to the clause "marked as confidential or proprietary." These clauses are separated only by "and." The first of these parallel clauses surely applies broadly to "any information" in the first line of the paragraph, so the second of these parallel clauses should as well.

Also, this interpretation is harmonious with the sentence regarding orally transmitted information, which requires written documentation of the confidential or proprietary nature of information broadly for *any* orally transmitted information to be "Confidential Information."

But that does not end the issue. The last part of paragraph 1 perplexes. Here it is just as it appears in the confidentiality agreement:

Any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to Commercial/Military Vehicle Frame Feasibility Study

(*Id.*) Paragraph 1's conclusion is not a sentence. It never explicitly justifies or explains itself. It starts by mentioning "any information" with value to the Disclosing Party and not generally known to its competitors, like the initial "any information" mentioned at the beginning of the paragraph, and then it includes a reference to the frame feasibility study. But then it drops its thought, like a bored child dropping a toy, and moves on to something else. It doesn't even bother to end with a period.

Ruehl argues the last part of paragraph 1 means information with value to the Disclosing Party and not generally known to its competitors, including information related to the frame feasibility study, is protected confidential information even if it is not marked as confidential or proprietary, because the last part does not include a "marked" clause. But the last part doesn't include a "disclosed" clause either. Ruehl's interpretation would render the "marked" clause, and other clauses, mere surplusage.

AM General argues the last part merely identifies another example of information that could be confidential if properly marked. The Court is inclined to agree with AM General's interpretation on this point. Interpreting the last line as an inartful addition to the list of non-exclusive particulars seems more sensible than interpreting it as a revocation of multiple clauses that come immediately before it, like "disclosed to Receiving Party," "marked as confidential or proprietary," "identified as proprietary or confidential," and "notice is subsequently provided in writing."

The Court is inclined to conclude that the confidentiality agreement required Ruehl to mark his information as confidential or proprietary in order to satisfy the definition of "Confidential Information" and be protected by the agreement. But since the claims pertaining to rights over the patent on the basis of the protective order survive summary judgment, since the parties did not thoroughly address the potential ultimate rights of the parties in the event that AM General's claims grounded on the purchase orders fail *and* Ruehl's claim of breach of the confidentiality agreement fails, and since the parties did not thoroughly address the first part of paragraph 9 of the purchase orders, the Court declines to grant summary judgment regarding Ruehl's claim for breach of the confidentiality agreement at this stage, with leave granted to the parties to address this issue later.

**E.      Conclusion**

For these reasons, the Court **DENIES** AM General's motion for partial summary judgment (DE 50) and **DENIES** Ruehl's motion for partial summary judgment (DE 54). Since the Court does not dispose of the ownership or related issues at this stage, it also does not dispose of the breach of warranty counter-claim at this stage.

The Court also **DENIES** the motions for oral argument (DE 53 and DE 58) as moot.

**SO ORDERED** on March 28, 2017.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE