PHILLIP C. RUEHL and PC RUEHL
ENGINEERING, INC.,

        Plaintiffs,

        v.                                 CAUSE NO.: 3:14-CV-317-TLS

AM GENERAL LLC,

        Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant AM General's Supplemental Motion for

Partial Summary Judgment [ECF No. 74]. The motion is briefed and is ripe for ruling.

The case is a dispute over ownership rights to a patent related to vehicular frame rails. In his

Amended Complaint [ECF No. 22], Plaintiff Ruehl[1] raises claims against AM General LLC

("AM General") for patent infringement and breach of contract. AM General filed Defendant's

Answer and Affirmative Defenses to Plaintiffs' Amended Complaint and Counterclaim [ECF

No. 25], denying Ruehl's allegations, raising affirmative defenses, raising counterclaims for

breach of warranty and breach of contract, and asking for a declaratory judgment that it either

owns the patent in question or has an irrevocable license to use it.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[1] Unless noted otherwise, this Order will refer to Plaintiffs Phillip C. Ruehl and PC Ruehl Engineering, Inc.
collectively as "Ruehl."

Civ. P. 56(a). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). "To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in [his] favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017). However, the nonmoving party "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citing *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014)). Likewise, irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## STATEMENT OF MATERIAL FACTS

When considering this motion, the Court views the facts in the light most favorable to Ruehl as the nonmoving party. The following statement of facts, including footnotes, is directly quoted from the Court's March 28, 2017 Opinion and Order [ECF No. 69] denying both parties' Motions for Partial Summary Judgement [ECF Nos. 50, 54]:

1. **Mother Necessity**

The parties agree Ralf Pionke of AM General contacted his former co-worker Philip Ruehl in late 2004 or early 2005 about consulting with AM General on a project to upgrade the frame rails for its Humvee line of trucks.

Mr. Pionke sent Mr. Ruehl drawings of the then-current side rail design on February 17, 2015 (via email), and on February 23, 2005 (via UPS). AM General claims Mr. Ruehl admitted that once he had its print drawings, which he did not receive until February 25, 2005, he looked at them and wanted to modify the spacers.[2]

### 2. February purchase order

Mr. Ruehl signed a purchase order on February 26, 2005. The front of this purchase order says: "This purchase order is issued to cover cost to provide engineering support for HMMWV frame rail feasibility study." (Feb. Purchase Order, DE 51-13 at 2.) It also caps the cost at $22,500. (*Id.*) It warns: "ACCEPTANCE OF THIS ORDER CONSTITUTES AN ACCEPTANCE OF THE TERMS AND CONDITIONS ON FACE AND REVERSE HEREOF." (*Id.*)

The back of this purchase order says:

1. This order constitutes the entire agreement between the parties hereto and the terms and conditions set forth herein cannot be modified or amended without the written consent of the Purchaser. No officer, employee or other representative of Purchaser is authorized to make any oral contract of commitment for the purchase of materials or to modify or change the terms and conditions of this order unless such modification or change is in writing approved by Vice President of the Purchaser.

. . .

5. It is understood and agreed the Seller warrants that the sale or use of the material covered by this order, either alone or in combination with other materials, will not infringe or contribute to the infringement of any patents, either in the U.S.A. or in foreign countries, and that the Seller covenants to defend every

---

[2] AM General cites page 40, lines 9 through 17, of Mr. Ruehl's deposition (Ruehl Dep., DE 51-11 at 8). But this portion of the deposition does not definitively support AM General's claim of admission.

suit which shall be brought against the Purchaser or any party selling or using any of the Purchaser's products for any alleged infringement of any patent by reason of the sales or use of said materials, either alone, or in combination with other materials, and to pay all expenses and fees of counsel which shall be incurred in and about defending, and all cost, damages and profits recoverable in every such suit.

. . .

9. Information, including but not limited to technical information, drawing and data, submitted any time by Seller to Purchaser relating to goods or services covered by this purchase order are deemed not to be submitted in confidence unless otherwise specifically agreed to in writing. Any restrictive markings affixed upon any such information furnished to Purchaser shall be of no force or effect, may be modified, removed or ignored by Purchaser without any liability to Seller and the information may be used by Purchaser in any way in the conduct of its business. Seller's sole rights with respect to use of such information by Purchaser, it's [sic] successors, subsidiaries, licenses, affiliates or parents shall be determined only by valid pre-existing patent rights of Seller as related to the manufacture, use or sale of goods or services covered by this order. Seller agrees to promptly notify Purchaser of any pre-existing patents of any other form of protection which Seller may hold or know of which relates to the goods or services to be provided under this purchase order. In connection with the development of any ideas, inventions, improvement or discoveries, including all related information and know-how, related to the goods or services to be provided under this purchase order and for which Purchaser has provided or is to provide support to Seller in the form of funding, including but not limited to payments in whole or part for prototype components or tooling, designing, testing or consulting, Purchaser shall automatically be entitled to and Seller agrees to and hereby assigns all rights, title and interest to such ideas, inventions, improvements and discoveries (unless otherwise specifically agreed to in writing and such event Purchaser shall be entitled to at least a nonexclusive paid up, irrevocable worldwide right and license including the right to fully sublicense third parties including the U.S. Government for all Governmental purposes to practice and have practiced for its purpose such invention). Seller agrees to promptly notify Purchaser in writing of any such idea, invention, improvement or discovery so developed. The provisions of this clause shall survive termination of fulfillment of this order and shall incur to the benefit of Purchaser's successors, subsidiaries, licensees, affiliates of parents.

(Feb. Purchase Order, DE 51-13 at 3.3[3])  Mr. Ruehl acknowledges that his signature on this

document commits him to its terms.

---

[3] Some apparent instances of the word "of" might actually be "or," and vice versa. The document is difficult to read in places.

### 3. Original concept sketch: March 5, 2005

On March 5, 2005, Mr. Ruehl sketched the big idea at the heart of this case. But the parties disagree about the genesis of this idea.

Mr. Ruehl claims in his amended complaint he conceived the idea before signing the purchase order on February 26, 2005. But he testified on November 19, 2015: "The iterative process of inventing the concept was completed on March 5, 2005." (Ruehl Dep., DE 51-11 at 15.) And on April 14, 2016, Mr. Ruehl signed his declaration stating: "None of my invoices to AM General included charges for my work inventing my new frame rail concept, which was completed no later than March 5, 2005 (and, to my best recollection, earlier than that.)" (Ruehl Decl., DE 55-3 at 2.)

AM General argues there is no evidence Ruehl conceived the idea before signing the February purchase order other than his say-so. AM General argues the evidence demonstrates that the spacer concept was not completed until March 5, 2005, and that the idea continued to develop after that date: "[T]he undisputed evidence demonstrates that Ruehl, after reviewing AMG's frame rail drawings and signing the February PO, came up with a spacer concept and then spent three weeks further refining and developing this concept as part of the engineering support he provided to AMG." (AM General's Br. Opp'n Pl.'s Mot. Partial Summ. J., DE 60 at 20.)

Not only do the parties disagree about the genesis of the idea, they also disagree about what happened to the idea after Ruehl sketched it on March 5, 2005. Ruehl claims the idea never changed or developed after that date, or perhaps even for some time before. Ruehl claims no one refined, tested, supported, or funded the idea after that date, or perhaps even for some time

before. AM General, however, argues that the idea was subject to continued development, refinement, and testing during the following months.

The parties refer to the idea in various ways. Ruehl refers to it as an invention "comprised of a box-type frame rail assembly," and as "a much improved means of assembling frame rails." (Am. Compl., DE 22 at 4, 6.) He says the patent, entitled "Boxed Frame Member and Method for Manufacture," covers the invention. (*Id.* at 7.)

AM General refers to the idea as a "spacer concept." (AM General's Br. Supp. Mot. Partial Summ. J., DE 51 at 5.) AM General denies the amended complaint's detailed definition of the invention is accurate, but admits the patent relates to the new frame rail design. Mr. Ruehl also refers to the idea as "my spacer concept" in correspondence. (Email, Dec. 1, 2005, DE 52-7 at 3.) For the sake of simplicity, the Court will use "idea" to reference the contested intellectual property.

On March 5, 2005, Mr. Ruehl showed the sketch of the idea to Werner Kraenzler, a prototype shop owner, who confirmed he believed he could make a prototype of the idea. Mr. Ruehl did not identify the idea as confidential.

### 4. "Kick-off" meeting: March 7, 2005

On March 7, 2005, Ruehl met with representatives of Applied Technologies, Inc., and Mr. Pionke at AM General's facility in Livonia, Michigan. Ruehl claims he showed the ATI representatives his sketch of the idea before Mr. Pionke even entered the room.

At that meeting, after disclosing his idea to the ATI representatives and to Mr. Pionke, Ruehl signed a confidentiality agreement presented to him by AM General. R.J. Gula, a vice president of AM General, signed it the next day.

### 5. Confidentiality agreement: March 7, 2005

The confidentiality agreement states:

1. "Confidential Information" shall mean any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to all of the Disclosing Party's trade secrets, designs, specifications, ideas, concepts, plans, formulas, patterns, devices, software, drawings, machinery and equipment, products, processes, procedures, methods, applications, technologies, financial information, customer information (including identity, specific needs and any of such customer's information possessed by the Disclosing Party) or any compilation or combination of the foregoing that is disclosed to Receiving Party and marked as confidential or proprietary. Any information that is transmitted orally shall be considered to be Confidential Information, provided such information is identified as proprietary or confidential at the time of such oral transmittal and notice is subsequently provided in writing of its confidential or proprietary nature by Disclosing Party and transmitted to Receiving Party within ten (10) days of such oral transmission. Any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to Commercial/Military Vehicle Frame Feasibility Study

2. Information of the Disclosing Party shall not be considered "Confidential Information" if it:
> (a) Is publicly known to the Receiving party at the time of disclosure;
> (b) Becomes public knowledge without breach of this Agreement by Receiving Party;
> (c) Is known to Receiving Party at the time of the disclosure and is not subject to any restriction that would be violated by its disclosure;
> (d) Is lawfully obtained, without restriction that would be violated by the disclosure by Receiving Party, from a third party not affiliated with Disclosing Party; or
> (e) Is independently developed by Receiving Party by employees of Receiving Party who have not had access to the Confidential Information or by third parties unrelated to Disclosing Party.

. . .

11. Nothing contained in this Agreement shall be construed as granting or conferring to Receiving Party any patent rights or licenses from Disclosing Party either expressly or by implication.

. . .

15. This Agreement reflects the entire agreement of Company and AMG with respect to the subject matter hereof and supersedes all prior oral and written representations, warranties, covenants, commitments, guarantees, and other agreements about the same subject matter hereof.

. . .

20. This Agreement shall be governed by and construed in accordance with the laws of Indiana without reference to conflicts of law principles, and the parties agree to be subject to the jurisdiction of the courts of Indiana. Any legal action to enforce this Agreement shall be brought in St. Joseph County, Indiana.

(Mutual Confidentiality Agreement, DE 22-1 at 1–3.)

### 6. Frame rail feasibility study

After the meeting on March 7, 2005, Ruehl worked with AM General and ATI on the frame rail feasibility study. The parties disagree about whether this work included work on the idea itself.

On March 24, 2005, Ruehl completed a report summarizing his work. He identified the spacer concept as a "key feature" of his proposed redesigned frame rails. He did not mark the report, or anything included in the report, as confidential.

On March 28, 2005, he emailed Mr. Pionke drawings, including a drawing of the spacer concept. Ruehl did not mark the drawing as confidential.

### 7. Invoices

Mr. Ruehl billed AM General for his work via two invoices dated March 29, 2005. The first invoice itemizes travel expenses with precision, and totals $2,699.58. (Invoice # 120, DE 51-2 at 2.) The first three items on the list bill for travel on March 6, 2005.

The second invoice does not specify the dates it covers, nor does it itemize the work for which Ruehl billed. The second invoice indicates he chose not to bill for 3.5 days of work, as a "Professional Courtesy." (Invoice # 121, DE 51-3 at 2.) In an email to Mr. Pionke dated March 30, 2005, Mr. Ruehl apparently explained that he reduced the bill to keep it under the budget of $22,500: "I have adjusted billing to remain within budget; but we have exhausted the allocated funds." (Email, Mar. 30, 2005, DE 51-9 at 2.) In an attachment to another email, he apparently

sheds further light on the bill: "I pondered the problem for weeks with nothing to show. The problem is as old as the industry. I could not consider billing for such 'dreaming', with high probability of failure -- in 100 years the problem had not been solved." (Email, Dec. 1, 2005, DE 52-7 at 4.) The second invoice seeks $19,800.

The combined total of these two invoices is $22,499.58. AM General paid this amount to Ruehl. Ruehl claims the invoices did not include any time spent conceiving the invention.[4]

### 8. April purchase order

On April 21, 2005, AM General sent Ruehl a second purchase order for "ENGINEERING SUPPORT OF FRAME RAIL REVIEW." (Apr. Purchase Order, DE 51-16 at 2.) The April purchase order and the February purchase order carry the same terms on their backs. Ruehl signed the April purchase order on April 24, 2005.

Again, the parties dispute the nature of the work Ruehl performed under the April purchase order. AM General claims Ruehl took an active role in evaluating the spacer concept and was instrumental in arranging meetings between AM General and the prototype shop to produce prototype rails incorporating the spacer concept. AM General claims his work included development of the idea itself. Ruehl denies this, and instead claims that the idea itself did not change or develop during this time period.

Pursuant to an invoice following the April purchase order, AM General paid Ruehl an additional $15,027.93.

### 9. Patent

---

[4] Invoice # 121, dated March 29, 2005, seems to bill for 20 days of work at $1,200 per day and seems to deduct 3.5 days for "Professional Courtesy." (Invoice # 121, DE 51-3 at 2.) There are not many days between March 5, 2005, when the idea might have been completed and March 29, 2005, the date of the invoice. March 29 minus 20 days is about March 9. Did Ruehl work full days and almost all weekends during this period? Maybe. And what precise work did Ruehl do under the heading "Professional Services"? These are the sorts of factual issues the Court cannot resolve at this stage.

AM General claims that in the fall of 2005, after it had spent money in both phases to have the spacer concept developed, defined, tested, and prototyped, AM General concluded that the spacer concept Ruehl developed for it was patentable. Ruehl argues AM General did not fund the spacer concept itself, but only funded its application to AM General's needs.

On November 1, 2005, Ruehl filed a patent application. On November 7, 2005, Ruehl requested for the first time that AM General pay him royalties for using the spacer concept.

On February 1, 2006, AM General filed its own patent application. AM General listed Ruehl as the sole inventor and listed itself as the sole owner.

On July 16, 2013, the United States Patent and Trademark Office issued to Ruehl a patent covering the idea. This patent, called "Boxed Frame Member and Method for Manufacture," embodies the spacer concept.

## PRIOR SUMMARY JUDGMENT PROCEEDINGS

The parties previously traded motions for partial summary judgment. AM General sought summary judgment in its favor on both of Ruehl's claims and on its own declaratory judgment and warranty counterclaims. AM General argued that Ruehl contractually assigned to it all rights to the "idea" under the portion of paragraph nine of the February purchase order[5] stating that Ruehl "assigns all rights, title, and interest" for which he was to provide support; that if neither the assignment nor license are effective then Ruehl breached the warranty in the purchase orders; and that the March 7, 2005 Mutual Confidentiality Agreement ("MCA") (previously referred to by the Court in the March 28, 2017 summary judgment ruling as the "confidentiality agreement") did not apply to the information Ruehl claimed was protected thereunder. Ruehl also sought summary judgment on the issues of ownership and confidentiality. Ruehl argued that

[5] The remainder of this Opinion and Order will refer to the February purchase order as the "purchase order."

the purchase orders did not transfer any rights over the "idea" to AM General and that the MCA protected Ruehl's rights.

On March 28, 2017, the Court issued the Opinion and Order denying both parties' motions. Opinion & Order, ECF No. 69. The Court rejected AM General's interpretation of the clause in paragraph nine of the purchase order, concluding that the assignment clause required that AM General actually have supported the development of the "idea" to automatically assign rights to AM General. *Id.* at 15. At the same time, the Court rejected Ruehl's motion for summary judgment on the grounds that there were genuine issues of material fact regarding whether AM General actually had supported the development of the idea, as well as regarding the "timing, process, and progress of the idea." *Id.* at 16–18. The Court's Opinion and Order did not reach AM General's counterclaim for breach of warranty. *Id.* at 22.

The Court's Order also flagged for the parties that the first portion of paragraph nine of the purchase order was potentially dispositive as it provided that information transmitted to AM General could be "used by [AM General] in any way in the conduct of its business." *Id.* at 18. AM General accepted the Court's invitation to brief the issue and brought the instant motion.

## ANALYSIS

AM General now argues that under paragraph nine of the purchase order, information disclosed to it by Ruehl could be "used by [AM General] in any way in the conduct of its business." Br. in Supp. Def. AM General's Suppl. Mot. Partial Summ. J. at 5, ECF No. 75. AM General argues that this applies to the "idea,"[6] which the parties agree was transmitted to AM General by Ruehl both on March 7, 2005, and on March 28, 2005. *Id.* at 6. If this is correct, and

---

[6] Like the Court's previous Order [ECF No. 69], the Court will refer to the spacer concept embodied in the '930 patent as the "idea."

AM General can use the "idea" which was the basis for the '930 patent "in any way," then Ruehl's claims fail.

AM General argues that the claim for patent infringement would fail because AM General cannot infringe on the '930 patent if it can make free use of the underlying idea. *See* 35 U.S.C. § 271(a) ("[W]hoever *without authority* makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." (emphasis added)). Because paragraph nine would give AM General the authority to use the "idea" in whatever way it wanted, AM General could not infringe on the '930 patent by definition under this theory. Ruehl does not appear to contest the argument that, if paragraph nine of the purchase order is effective in assigning rights to the "idea" to AM General, his patent infringement claim fails.

AM General also argues that Ruehl's breach of contract claim fails because the documents transmitting the "idea" to AM General were never marked as the MCA requires, meaning that the MCA did not provide Ruehl with any rights. ECF No. 75 at 12. If that were correct, then the documents containing the "idea" would not be considered confidential and, defaulting back to the purchase order, AM General would be free to us the "idea" however it wanted.

However, Ruehl argues that the MCA superseded paragraph nine of the purchase order, rendering it inoperative. Pls.' Br. Opp'n Def.'s Suppl. Mot. Partial Summ. J. at 10, ECF No. 87. Under this theory, his patent infringement claim would survive at a minimum because, even if the MCA did not apply to the '930 patent, AM General would not have authorization to use the "idea." He also argues that the MCA applies to the '930 patent, meaning that, even if paragraph nine of the purchase order were still operative, the designation of rights from the MCA would

control and the purchase order would not grant AM General any rights. *Id.* at 11. Ruehl raises two main arguments as to why the MCA controls. First, he argues that his signature on the March 5, 2005 document is sufficient to satisfy the "marking" requirement of the MCA. *Id.* at 12. Second, he argues in the alternative that AM General waived the marking requirement of the MCA through conduct. *Id.* at 13. Ruehl also raises other arguments arising from AM General's counterclaim against him in this matter.

Thus, there are two main issues before the Court. First, does the MCA modify and supersede paragraph nine of the purchase order? Second, did Ruehl maintain all rights to the "idea" under the MCA?

## A.     Purchase Order and Superseding Effect of the Mutual Confidentiality Agreement

Ruehl and AM General disagree about the effect of the MCA on the purchase order. AM General argues that the purchase order, allowing it to use the "idea" "in any way," controls the parties' rights and that the MCA is inapplicable and therefore cannot supersede the purchase order. ECF No. 75 at 5. In contrast, Ruehl argues that the section of paragraph nine of the purchase order allowing AM General use of the "idea" was "rendered a nullity" when the MCA superseded that provision. Pls.'s Sur-Reply Opp'n Def.'s Supp. Mot. Partial Summ. J. at 10, ECF No. 92-1. Whether the MCA supersedes paragraph nine of the purchase order is potentially outcome determinative. If AM General is correct, Ruehl's breach of contract claim fails because the MCA is inapplicable and Ruehl's patent infringement claim fails because paragraph nine of the purchase order grants AM General the right to use the "idea" Ruehl submitted within the March 5, 2005 drawing.

Because this case involves the contested assignment of rights to a patent, Indiana contract law applies to the Court's interpretation of the purchase orders. *Euclid Chem. Co. v. Vector*

*Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 2009) ("Construction of patent assignment agreements is a matter of state contract law." (quoting *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1370 (Fed. Cir. 2008))). Because this case involves the interpretation of the MCA and the alleged breach of that agreement, which is a supplemental state law claim, Indiana contract law also applies to the Court's interpretation of the MCA. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

Under Indiana law, the Court interprets contracts by examining the intent of the parties as expressed within the four corners of the contract. *McCae Mgmt. Corp. v. Mercs. Nat'l Bank & Tr. Co. of Indianapolis*, 553 N.E.2d 884, 887 (Ind. Ct. App. 1990). A court should give a contract's language its plain and ordinary meaning, unless the contract uses a particular term in a manner intended to convey a specific technical concept. *Citizens Action Coal. of Ind., Inc. v. Duke Energy Ind., Inc.*, 44 N.E.3d 98, 108 (Ind. Ct. App. 2015). Within the four corners, the Court "must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes them to be conflicting." *McCae Mgmt. Corp.*, 553 N.E.2d at 887. "The contract must be read as a whole when trying to ascertain the parties' intent." *OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1315 (Ind. 1996). "The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone." *Evan v. Poe & Assocs., Inc.*, 873 N.E.2d 92, 98 (Ind. Ct. App. 2007). "We read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless." *Whitaker v. Brunner*, 814 N.E.2d 288, 294 (Ind. Ct. App. 2004). A court should construe a contract "in a way that gives each term independent meaning, rather than rendering one surplusage." *Pohl v. Pohl*, 15 N.E.3d 1006, 1014 (Ind. 2014). "In most cases, construction of

a written contract is a question of law for the court, with summary judgment being particularly appropriate." *McCae Mgmt. Corp.*, 553 N.E.2d at 887.

Here, whether the MCA had the potential to supersede paragraph nine of the purchase order is dependent on if there are conflicting terms between the two contracts. *See Morris v. Trinkle*, 170 N.E. 101, 104–05 (Ind. App. 1930); *see also Acequia, Inc. v. Prudential Ins. Co. of Am.*, 226 F.3d 798, 803 (7th Cir. 2000) ("[A] new contract with reference to the subject matter of a former one does not supersede the former and destroy its obligations, *except in so far as the new one is inconsistent therewith*, when it is evident from an inspection of the contracts and from an examination of the circumstances that the parties did not intend the new contract to supersede the old, but intended it as supplementary thereto." (applying Idaho law) (quoting *Silver Syndicate, Inc. v. Sunshine Mining Co.*, 611 P.2d 1011, 1020 (Idaho 1979))); *see also* Restatement (First) of Contracts § 408 (1932) ("A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract."). If the two agreements can apply coextensively, then the question of whether the MCA superseded paragraph nine of the purchase order is irrelevant. *See* Restatement (First) of Contracts § 408 (1932). So the Court begins its analysis by answering the question of whether the documents conflict with each other.

And paragraph nine of the purchase order and MCA do not contradict each other. The relevant language of the purchase order is as follows:

> Information, including but not limited to technical information, drawing and data, submitted any time by Seller to Purchaser relating to goods or services covered by this purchase order are deemed not to be submitted in confidence unless otherwise specifically agreed to in writing. Any restrictive markings affixed upon any such information furnished to Purchaser shall be of no force or effect, may be modified, removed or ignored by Purchaser without any liability to Seller and the information may be used by Purchaser in any way in the conduct of its business.

Purch. Order at 3, ECF No. 51-13.

The relevant language of the MCA is as follows:

"Confidential Information" shall mean any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to all of the Disclosing Party's trade secrets, designs, specifications, ideas, concepts, plans, formulas, patterns, devices, software, drawings, machinery and equipment, products, processes, procedures, methods, applications, technologies, financial information, customer information (including identity, specific needs and any of such customer's information possessed by the Disclosing Party) or any compilation or combination of the foregoing that is disclosed to Receiving Party and marked as confidential or proprietary.

Mutual Confidentiality Agreement at 1, ECF No. 22-1.

Ruehl argues that the language of the purchase order that "[a]ny restrictive markings affixed upon any such information furnished to Purchaser shall be of no force or effect" and that documents transmitted to AM General may be "may be used . . . in any way in the conduct of its business" conflicts with the language of the MCA instructing that information "marked as confidential or proprietary" will be considered "confidential information" and instructing that each party maintains its rights to such information. But this interpretation requires that the Court interpret the purchase order in a way that is not only nonsensical but is also internally contradictory.

According to the plain language of paragraph nine of the purchase order, "Information . . . submitted any time by Seller to Purchaser relating to goods or services covered by this purchase order are deemed not to be submitted in confidence unless *otherwise specifically agreed to in writing*." ECF No. 51-13 at 3 (emphasis added). This makes it clear that the terms in paragraph nine of the purchase order regarding transmittal of information from Ruehl to AM General are a default procedure, but that the parties are free to override that default by way of a separate writing. The MCA is such a writing.

To interpret the purchase order otherwise and read the second sentence in paragraph nine regarding the ineffectiveness of restrictive markings as an absolute, as opposed to a default statement allowing for the possibility of an alternate procedure by separate written agreement, renders the purchase order internally contradictory. This is because the second sentence regarding the ineffectiveness of restrictive markings has no modifiers, and interpreting that provision as an absolute would dictate that it apply regardless of whether there was a separate written agreement as allowed for in the first sentence. *Compare* ECF No. 51-13 at 3 ("Any restrictive markings affixed upon any such information furnished to Purchaser shall be of no force or effect, may be modified, removed or ignored by Purchaser without any liability to Seller and the information may be used by Purchaser in any way in the conduct of its business."), *with id.* ("Information . . . submitted any time by Seller to Purchaser relating to goods or services covered by this purchase order are deemed not to be submitted in confidence unless otherwise specifically agreed to in writing.").

Under such an interpretation, either the second sentence regarding the ineffectiveness of restrictive markings could be enforceable, or the first sentence allowing for specific agreements in writing to control could be enforceable, but not both. And basic law of contracts strongly discourages an interpretation that causes contract language to be internally contradictory. *See OEC-Diasonics, Inc.*, 674 N.E.2d at 1315.

A much more reasonable interpretation of the contract is that the first two sentences of paragraph nine of the purchase order set the default terms for the transmittal of information from Ruehl to AM General, but also allow for those default terms to be overridden by specific exceptions, as agreed to in writing. This interpretation renders the purchase order internally

consistent, as the Court is required to do if possible. *Id.* It also seems more likely to be the parties' actual intent at the time of execution based on the context of the entire purchase order.

The next question is whether the first two sentences of paragraph nine of the purchase order conflict with the MCA. They do not. The purchase order sets the default terms for the transmission of information from Ruehl to AM General but allows for exceptions that are "otherwise specifically agreed to in writing." ECF No. 51-13 at 3. When there is information transmitted from Ruehl to AM General that fits within the terms of the MCA, then the MCA controls the rights and obligations between the parties; this includes the markings having the effect of rendering the transmitted information confidential and thereby creating rights for the disclosing party. If the information transmitted does not fit within the terms of the MCA, then paragraph nine of the purchase order and its default provision control.

For example, to step outside the confines of this case and specifically the "marking" requirement of the MCA, imagine that Ruehl had submitted to AM General a document marked "confidential" containing lyrics from a popular song. Applying the purchase order and the MCA, the MCA might apply. The document is marked as "confidential," so the requirement that the document be "marked confidential or proprietary" is met. ECF No. 22-1. And the lyrics could also hypothetically meet the requirement that the information "has value to the Disclosing Party." *Id.* But such a document would fail the requirement in the MCA that the information be "not generally known." *Id.* Therefore, the MCA would not be applicable, and the parties' rights would be determined by paragraph nine of the purchase order. Under paragraph nine, the fact that the lyrics were marked as "confidential" would have no effect on the parties' rights, and AM General would be able to use the lyrics without regard to Ruehl's rights to them, notwithstanding applicable copyrights of course.

Similarly, if the MCA does not apply here regarding the "idea," then paragraph nine of the purchase order applies. If that is the case, then AM General is correct that it is entitled to summary judgment on Ruehl's breach of contract claim because the "idea" is not protected by the MCA. It would also then be entitled to summary judgment on Ruehl's patent infringement claim because paragraph nine allows AM General to use the information Ruehl submitted to them, i.e. the "idea," "in any way in the conduct of its business." ECF No. 51-13 at 3. This would negate the "without authority" element of the patent infringement claim. *See* 35 U.S.C. § 271(a).

Ruehl contends that, because AM General does not explicitly argue in its opening brief that the MCA does not supersede paragraph nine of the purchase order, his patent infringement claims must survive this motion for summary judgment. ECF No. 92-1 at 9. He reasons that this failure to raise the argument means that paragraph nine of the purchase order is inoperative regardless of whether the MCA applies and protects the "idea." *Id.* In contrast, AM General responds that it does not matter whether or not the MCA supersedes the purchase order because Ruehl did not mark as "confidential" or "proprietary" the March 5, 2005 drawing and, as a result, the MCA is not applicable. Opp. Pls.' Mot. Leave File Sur-Reply AM General's Reply Brief Supp. Suppl. Mot. Part. Summ. J. at 7, ECF No. 95. Both parties are incorrect.

When there exists either a modification to a contract that does not contradict prior terms, or a new contract between the same parties containing consistent terms, those uncontradicted prior terms stay in effect. *Acequia*, 226 F.3d at 803 ("[A] new contract with reference to the subject matter of a former one does not supersede the former and destroy its obligations, except in so far as the new one is inconsistent therewith." (quoting *Silver Syndicate*, 611 P.2d at 1020)).

Ruehl's argument fails because paragraph nine of the purchase order remains operative, regardless of whether the MCA is a modification or a new agreement, to the extent that it does

not conflict with the MCA. AM General's argument fails because, if the terms of paragraph nine are actually inconsistent with the MCA, then the inconsistent terms within paragraph nine of the purchase order would be superseded by the MCA and could not be operative, regardless of whether the MCA provided protection for any particular document.

Therefore, because the MCA does not conflict with the first two sentences of paragraph nine of the purchase order, the Court concludes that, if the MCA does not apply to the "idea" (discussed in the next section), then paragraph nine of the purchase order grants AM General the right to use the "idea" contained in the March 5, 2005 drawing "in any way."

**B.      Applicability of the MCA**

The next question before the Court is therefore whether the MCA applies. If the MCA applies, then paragraph nine of the purchase order does not and AM General does not have the right to use the "idea" under that contract. AM General therefore argues that the MCA does not apply because the documents containing the "idea" were never marked. Ruehl makes several counter arguments. First, he argues that his signature on the March 5, 2005 drawing containing the "idea" is sufficient to satisfy the marking requirement of the MCA. Second, he argues that, even if his signature does not meet the marking requirement, it is irrelevant because AM General waived the marking requirement of the MCA. Third, he raises arguments that are specific to AM General's supplemental interrogatory answers. Fourth, he argues that AM General's counterclaim is effectively a "judicial admission" that the MCA applies to his "idea." And fifth, Ruehl argues that equitable principles prevent AM General from arguing that the MCA does not apply to the "idea" because a party is not allowed to disclaim an obligation created by an agreement at the same time that s/he benefits from it.

**1.      *Marking Requirement***

The next question that the Court will address is whether Ruehl fulfilled the "marking" requirement of the MCA that is necessary for protection by that agreement.

Again, the relevant text of the MCA is as follows:

"Confidential Information" shall mean any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to all of the Disclosing Party's trade secrets, designs, specifications, ideas, concepts, plans, formulas, patterns, devices, software, drawings, machinery and equipment, products, processes, procedures, methods, applications, technologies, financial information, customer information (including identity, specific needs and any of such customer's information possessed by the Disclosing Party) or any compilation or combination of the foregoing that is disclosed to Receiving Party and *marked as confidential or proprietary*.

ECF No. 22-1 (emphasis added).

The parties do not appear to dispute that the drawings and documents submitted to AM General constituting the "idea" fulfill the first parts of this paragraph of the MCA, i.e. that it "has value to Disclosing Party and is not generally known to its competitors." The parties also do not appear to dispute that the "idea" was "disclosed" to AM General within the meaning of the MCA.

As an initial matter, in the Court's previous order [ECF No. 69 at 22], the Court noted that it was "inclined to conclude that the confidentiality agreement required Ruehl to mark his information as confidential or proprietary in order to satisfy the definition of 'Confidential Information' and be protected by the [MCA]." AM General argues that this amounts to a legal conclusion that the "idea," as contained within the March 5, 2005 drawing, "must have been marked as confidential or proprietary" for Ruehl to maintain his rights to it. ECF No. 75 at 12. Ruehl appears to challenge this by noting that the order only stated that this was an "inclination" and that, "Whether that 'inclination' amounts to an actual legal finding . . . is, we submit, unclear." ECF No. 87 at 12. However, while Ruehl suggests that the Court's previous statement

is not binding as a rule of law, he provides neither argument nor legal authority explaining why or how the statement is not binding on the parties. Therefore, the Court will assume without deciding, for the purposes of this motion, that the confidentiality agreement required Ruehl to "mark his information as confidential or proprietary" to qualify for protection under the MCA.

As this matter is before the Court on AM General's Motion for Partial Summary Judgement, the question of whether the documents transmitted in fact meet the marking requirement of the MCA is not before the Court. Instead, the Court is addressing the question: When viewed in the light most favorable to Ruehl, does the evidence before the Court establish that no reasonable fact finder could conclude that the documents transmitted to AM General were "marked as confidential or proprietary" within the meaning of the MCA? And when the question is framed in this way the answer is a conclusive "no."

The parties agree, and the evidence supports, that the March 5, 2005 drawing was a technical document that Ruehl signed and dated and that contained the "idea." The Court's previous Order already determined that "Mr. Ruehl did not identify the idea as confidential." ECF No. 69 at 5. But the Order expressed no opinion on whether the signature and date could constitute a mark designating the drawing as proprietary under the MCA.

The parties now contest this point. AM General argues that the only reasonable interpretation of the language in the MCA is that "the information must contain the marking 'Confidential' or 'Proprietary' or, at the *very* least, a synonym to that effect." Reply Brief in Supp. Def. AM General's Suppl. Mot. Partial Summ. J. at 4, ECF No. 90. Ruehl contends that the MCA's marking requirements are set forth in a "generalized and non-specific way," rendering the requirement ambiguous, which must then be construed against AM General as the drafter. ECF No. 92-1 at 6.

The Court is faced with two possible meanings for the marking requirement. Under AM General's proposed interpretation, to fulfill the marking requirement of the MCA, any document "must contain the marking 'Confidential' or 'Proprietary' or, at the *very* least, a synonym to that effect." ECF No. 90 at 4. Ruehl does not propose a specific interpretation, but does argue that something less should apply, such that his signature would suffice to fulfill the requirement. ECF No. 92-1 at 6.

"A basic principle of contract interpretation is that the court will apply definitions for defined terms, but undefined terms will be given their plain, ordinary meaning." *Lafayette Life Ins. Co. v. Arch Ins. Co.*, 784 F. Supp. 2d 1034, 1042 (N.D. Ind. 2011). A court should give a contract's language its plain and ordinary meaning, unless the contract uses a particular term in a manner intended to convey a specific technical concept. *Citizens Action Coal. of Ind.*, 44 N.E.3d at 108. If the clause is ambiguous, then Ruehl is correct in that it must be construed against AM General as the drafter. *See Heartland Crossing Found., Inc. v. Dotlich*, 976 N.E.2d 760, 763 n.3 (Ind. Ct. App. 2012). But while that is true in some cases, Indiana law mandates that this rule applies "only if we cannot ascertain the parties' intent from all the ordinary interpretative guides." *George S. May Int'l Co. v. King*, 629 N.E.2d 257, 260 (Ind. Ct. App. 1994).

As the clause "marked as confidential or proprietary" and the terms within the clause are undefined within the MCA, the Court must go to the "plain, ordinary meaning" of the terms.[7] *Id.*

---

[7] The Court notes that Ruehl, and to a certain extent AM General, focus on the meaning of the term "proprietary mark." But that is a term of art, referring to a concept that appears to be mainly relevant today as a historical basis for the modern trademark. *See* Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 Harv. L. Rev. 813, 814 (1927) ("The modern trademark has two historical roots: (1) the proprietary mark, which was optionally but usually affixed to goods by the owner, either for the benefit of illiterate clerks or in order that in case of shipwreck or piracy the goods might be identified and reclaimed by the owner. This mark was essentially a merchant's rather than a craftsman's mark and had nothing to do with the source of production of the goods in question."). Neither party has put forward any argument that the MCA used the term "proprietary mark" within that contract "in a manner intended to convey a specific technical concept" such that the rule from *Citizens Action* should apply. 44 N.E.3d at 108. And the Court is bound to apply ordinary definitions to undefined terms unless there is some obvious intent for a technical term to apply. *Id.* Because the MCA does not even include the term "proprietary

Unfortunately, there does not appear to be such a plain meaning of the phrase that is dispositive. The parties have not provided the Court with a widely accepted definition of how something may be marked as proprietary, and the Court's independent research has not revealed a "plain, ordinary meaning" either. Breaking the phrase down to its individual parts does shed some light on the matter.

Black's legal dictionary defines "mark" as, "A symbol, impression, or feature on something, usually to identify it or distinguish it from something else." *Mark*, Black's Law Dictionary (11th ed. 2019). Based on this definition of "mark," it is certainly possible that Ruehl's signature could apply. One example that Ruehl offers is a signature on a painting. It does not appear that the parties truly contest this point.

The real dispute on this issue is the effect of the "mark" of Ruehl's signature, i.e. whether it can be considered as identifying the document as "proprietary." Black's legal dictionary defines "proprietary" as: "1. Of, relating to, or involving a proprietor. 2. Of, relating to, or holding as property. 3. (Of a product) sold under a tradename." *Proprietary*, Black's Law Dictionary (11th ed. 2019). It defines "proprietor" as, "An owner, especially one who runs a business." *Proprietor*, Black's Law Dictionary (11th ed. 2019). Inserting the definition of "proprietor" into the first definition of "proprietary" yields the definition, "Of, relating to, or involving an owner, esp. one who runs a business." *Id.*

Putting these definitions together, it certainly appears that the phrase "marked as confidential or proprietary" could reasonably be interpreted to mean that Ruehl's signature marked the document as proprietary. As noted, there is not a genuine dispute about the signature

mark," the Court concludes that at this point there is no evidence of any manifestation of intent for the technical meaning of the term of art "proprietary mark" to apply. Therefore, the parties' analysis based on the term of art "proprietary mark" is inapposite.

constituting a "mark," only about what kind of "mark" is acceptable to qualify a document for protection under the MCA. Because the signature is unique to Ruehl and was written by his hand, it is "of, relating to, or involving" him. And he also fits the definition of "proprietor" because he is the owner of PC Ruehl Engineering, Inc., and, in that capacity, he is engaged in business as a consultant. Therefore, based on the plain and ordinary meaning of the phrases, it certainly seems that Ruehl's signature could qualify as marking the document as proprietary under the MCA.

But the analysis does not end there; AM General has identified two cases that it claims are particularly relevant to the disposition of this issue. While neither case is binding nor dispositive, both merit due consideration. In the first case, *Corinthian Mortgage Corp. v. ChoicePoint Precision Marketing., LLC*, the court analyzed a clause in a confidentiality agreement that required that confidential information be "clearly marked as proprietary, confidential or with other confidentiality notices when disclosed, or . . . is identified as proprietary, confidential or with other confidentiality notices on disclosure." No. 1:07CV832 (JCC), 2008 WL 4276921, at *1 (E.D. Va. Sept. 11, 2008). As AM General points out, the court did find that this clause was "facially unambiguous." *Id.* at *5. But the issue before that court was whether there was any marking requirement at all, not what was needed to fulfill that requirement. *Id.* at *3 ("SouthBanc has not claimed that it marked as confidential any of the underlying communications."). Here, the parties' dispute is not over whether a marking requirement exists; the dispute is focused on what specifically is required to "mark" a document within the meaning of the MCA. Thus, *Corinthian Mortgage Corp.* is not relevant to the instant dispute.

The second case, *Nilssen v. Motorola, Inc.*, is similarly unhelpful. 963 F. Supp. 664 (N.D. Ill. 1997). The relevant portion involved a nondisclosure agreement that contained the following two provisions:

> \* "Confidential Information" was defined as "any device, graphics, written information or information in other tangible forms that is disclosed . . . and that is marked at the time of disclosure as being 'Confidential' or 'Proprietary.'"

> \* Information disclosed orally or visually and identified at the time of such disclosure as "Confidential" was to be considered as "Confidential Information" only if reduced to tangible form, marked "Confidential" and transmitted to Motorola within 30 days of such oral or visual disclosure.

*Id.* at 668.

That court held that under these provisions "any disclosure that [the plaintiff] believed to be proprietary—including *previous* disclosures that had not been so marked—had to be in written form and stamped 'confidential.'" *Id.* at 681. The court noted that the agreement "specifically spelled out the only way in which [the plaintiff] could claim confidentiality as to any communication." *Id.* at 681 n.19.

Crucially, in that case the language of the agreement explicitly required that information be marked "'Confidential' or 'Proprietary.'" *Id.* at 668. The fact that the agreement in *Nilssen* both capitalized and put in quotes the words "confidential" and "proprietary" clearly demonstrated the intent of those parties to allow for only those two specific words to fulfill the marking requirement. *Id.*[8]

Here, in contrast, the exact language of the parties' agreement required that information be "marked as confidential or proprietary," where no words are capitalized or in parentheses.

---

[8] The Court has identified a third case that is potentially relevant to the instant dispute. The case *Maxtech Consumer Products, Ltd. v. Robert Bosch Tool Corp.* involves in relevant part a dispute about trade secrets. 255 F. Supp. 3d 833, 861 (N.D. Ill. 2017). But exactly like *Nilssen*, the confidentiality agreement in *Maxtech* required the disclosing party to clearly mark information "as 'Confidential' or 'Proprietary'" for the contract to provide protections. *Id.* As such, the case does not warrant a separate analysis.

ECF No. 22-1 at 1. This language at least potentially demonstrates an intent by the parties to allow for the MCA to apply to information that is marked other than strictly with the specific words "confidential" or "proprietary," creating an ambiguity in the interpretation of the clause.

To supplement its argument, AM General contends that allowing a signature to constitute a proprietary mark under the MCA would subvert the intention behind the marking requirement, i.e. to allow the receiving party to know what information is covered. ECF No. 90 at 4. It similarly argues that "under Ruehl's interpretation, *any* document that Ruehl signed would satisfy the marking requirement." *Id.* But while AM General is technically correct about the marking requirement, the MCA also contains other requirements in order for information to constitute "Confidential Information" under the MCA. The information, in addition to being marked, must also be "not generally known to [the disclosing party's] competitors, including but not limited to . . . trade secrets, designs, specifications, ideas, concepts, plans, formulas, . . ." and so forth. ECF No. 22-1 at 1. Further, the information must have "value to the Disclosing Party." *Id.* So, while AM General is technically correct that Ruehl's signature on any given document could fulfill the marking requirement of the MCA, the other requirements within the MCA still limit and provide notice to the receiving party of what information might be covered and significantly narrow what information the MCA could apply to.

The marking requirement could therefore require the parties to mark documents with the words "confidential" or "proprietary" in order to qualify for protection, or it could require something less exacting. Because there is more than one reasonable interpretation of the marking requirement, it is ambiguous. *See Ecorp, Inc. v. Rooksby*, 746 N.E.2d 128, 131 (Ind. Ct. App. 2001) (noting that a contract is ambiguous when reasonable people could come to differing opinions about its meaning).

Because the Court has concluded that the marking requirement is ambiguous and could have more than one potential meaning without reference to outside facts, the Court must determine the meaning of the marking requirement. When a contract is ambiguous because of the language within the four corners of the document, and not because of extrinsic evidence, the meaning of the language is a pure question of law that is appropriate for summary judgment. *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995) ("If a contract is ambiguous solely because of the language used in the contract and not because of extrinsic facts, then its construction is purely a question of law to be determined by the trial court.").

Ruehl argues that the canon of construction of *contra proferentem* should apply to the Court's interpretation of the MCA. ECF No. 87 at 12–13. Under this canon of construction, when other methods have failed to determine the intent of the parties, the Court is directed to interpret ambiguous clauses against the drafter. *See Heartland Crossing Found, Inc.*, 976 N.E.2d at 763 n.3. AM General has not argued that other canons of construction should apply, but simply argued that the contract is not ambiguous. ECF No. 90 at 4. Neither party has argued that specific canons of construction other than *contra proferentem* should apply, and the Court's independent research has not uncovered any alternate interpretative guides.

Here, AM General is undisputedly the drafter, and so the Court is obliged to interpret the marking requirement of the MCA against AM General and in Ruehl's favor. *See Heartland Crossing Found, Inc.*, 976 N.E.2d at 763 n.3. Thus, construing the ambiguity against AM General, the drafter, the Court concludes that the marking requirement does not require only that information be explicitly marked with the specific words "confidential" or "proprietary" but rather that something less exacting is permitted. *See Ecorp*, 746 N.E.2d at 131.

Because the MCA's marking requirement can be fulfilled by something other than the words "confidential" or "proprietary" and in light of the plain language defining the terms "mark" and "proprietary," the Court holds that a reasonable fact finder could conclude that Ruehl's signature was sufficient to fulfill the marking requirement of the MCA. If a fact finder concluded that the signature on the March 5, 2005 document fulfilled the marking requirement of the MCA, then the operative language in the MCA would control and paragraph nine of the purchase order would not apply. Therefore, AM General's motion for summary judgment on both Ruehl's patent infringement and breach of contract claims must be denied.

## 2.    *Waiver*

That does not end the Court's analysis. The Court will next address the question of whether, as Ruehl argues, AM General waived the marking requirement. While the Court's conclusion regarding what is necessary to fulfill the marking requirement is itself sufficient to deny summary judgment, the Court will also address the issue of waiver. It does so: because the parties have invested significant resources on the issue, including a separate discovery period specifically on the issue; in the interest of creating a thorough record; and because what is required to establish a waiver is a question of law for the Court. The questions before the Court now are whether: 1) Ruehl has established waiver of the marking requirement as a matter of law; 2) AM General has established that it did not waive the marking requirement as a matter of law; and 3) there is a genuine issue of material fact regarding waiver. *See Gordon*, 674 F.3d at 772–73.

The Court concludes that neither party has established the presence or absence of waiver as a matter of law. And further, there are genuine issues of material fact that stand in the way of the Court granting summary judgment.

Contract provisions can be waived. *See Integrity Ins. Co. v. Lindsey*, 444 N.E.2d 345, 347–48 (Ind. Ct. App. 1983). "Waiver is an intentional relinquishment of a known right, requiring both knowledge of the existence of the right and intention to relinquish it." *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000). The party alleging waiver of a right carries the burden of proof on the matter. *Union Fed. Sav. Bank v. INB Banking Co. Sw.*, 582 N.E.2d 426, 431 (Ind. Ct. App. 1991).

Waiver may be shown either expressly or impliedly, including by conduct. *Pohle*, 724 N.E.2d at 659. This determination turns on the conduct of the party alleged to have waived such a right and, unlike an estoppel analysis, is not affected by the reaction or reliance of the non-waiving party. *2444 Acquisitions, LLC v. Fish*, 84 N.E.3d 1211, 1217 (Ind. Ct. App. 2017) ("A person who is in a position to assert a right or insist upon an advantage may, by his own words or conduct, and without reference to any act or conduct of the other party affected thereby, waive such right." (quoting *Lafayette Car Wash, Inc. v. Boes*, 282 N.E.2d 837, 839 (Ind. 1972))); *see also Tate v. Secura Ins.*, 587 N.E.2d 665, 671 (Ind. 1992) ("[T]here is a distinction between 'waiver' and 'estoppel.' A waiver is an intentional relinquishment of a known right and is a voluntary act, while the elements of estoppel are the misleading of a party entitled to rely on the acts or statements in question and a consequent change of position to his detriment." (quoting *Travelers Ins. Co. v. Eviston, Adm'r*, 37 N.E.2d 310, 314 (Ind. App. 1941))).

The existence of waiver may be implied from the acts, omissions, or conduct of one of the parties to the contract. *Am. Standard Ins. Co. of Wis. v. Rogers*, 788 N.E.2d 873, 877 (Ind. Ct. App. 2003). Waiver by conduct is not accomplished by inadvertent action but requires that the waiving party's conduct manifest an intent to waive the relevant provision. *Hastetter v. Fetter Properties, LLC*, 873 N.E.2d 679, 684 (Ind. Ct. App. 2007) ("[S]ilence, inactivity, or

acquiescence is not waiver unless the party against whom waiver is claimed had a duty to act or speak."); *see also J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 1000 (7th Cir. 1980) ("Waiver, we pointed out, focuses on intent. If an individual intentionally relinquishes a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it.").

Provisions may be waived even when a contract has a "no waiver" clause. *Am. Standard*, 788 N.E.2d at 877 ("[W]e reject American Standard's contention that the no-waiver clause in the Policy immunizes it against application of the doctrines of waiver and estoppel."). While AM General argues that waiver of "no waiver" provisions in such contracts requires a higher standard of proof of clear and convincing evidence, it has failed to cite to any Indiana law, the law governing the interpretation of the MCA, requiring such a higher standard. *See* Def. AM General LLC's Suppl. Brief in Supp. Suppl. Mot. Part. Summ. J. at 5, ECF No. 112 (citing *Wis. Elec. Power Co. v. Union Pac. R.R. Co.*, 557 F.3d 504, 508–09 (7th Cir. 2009) (applying Wisconsin law); *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 277 (7th Cir. 1996) (applying Illinois law)).[9] Similarly, while AM General argues that the MCA's clause restricting modifications to writing precludes a finding of waiver, provisions may be waived by conduct even when a contract dictates that it may only be modified in writing. *Cf. Sees v. Bank One, Ind., N.A.*, 839 N.E.2d 154, 161 (Ind. 2005) ("Even a contract providing that any modification thereof must be in writing, nevertheless may be modified orally.").[10]

---

[9] However, because it does not affect the disposition of this motion, the Court will assume *without deciding* that clear and convincing evidence is required to establish a waiver of a provision in a contract containing a "no waiver" clause.

[10] To conclude otherwise would require this Court to determine that "no waiver" provisions could themselves be waived, but "no non-written modifications" provisions could not be. AM General has cited to no authority holding as such.

Whether a contract provision was waived is typically a question of fact and is therefore ordinarily not suitable for summary judgment. *Phillips v. Green St. Corp.*, 237 N.E.2d 590, 595 (Ind. App. 1968). "[W]hile the existence of facts necessary to constitute waiver is ordinarily a question of fact, the question of what facts are necessary to constitute waiver is a matter of law." *Pohle*, 724 N.E.2d at 658. Therefore, if the facts are not in dispute and the only question is whether such facts constitute a waiver, then whether a party waived a specific right is a question of law and is suitable for summary judgment. *Jackson v. DeFabis*, 553 N.E.2d 1212, 1217 (Ind. Ct. App. 1990).

However, if the relevant facts are not in dispute but the intent that is inferred from those facts is in dispute, then the allegedly waiving party's intent is a question of fact that must be resolved by the jury unless the conduct unequivocally establishes the intent. *See Terry v. Int'l Dairy Queen, Inc.*, 554 F. Supp. 1088, 1095 (N.D. Ind. 1983) (applying Indiana law). To expand:

> It is essentially a matter of intention. Negligence, oversight, or thoughtlessness does not create it. The intention to relinquish the right or advantage must be proved. Occasionally it is proved by the express declaration of the party, or by his undisputed acts or language so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary. Then, the waiver is established as a matter of law. Commonly it is sought to be proved by various species of proofs and evidence, by declaration, by acts, and by nonfeasance, permitting differing inferences, and which does not directly, unmistakably, or [unequivocally] establish it. Then it is for the jury to determine from the facts as proved or found by them whether or not the intention existed.

*Id.* (quoting *Whipple v. Prudential Ins. Co. of Am.*, 118 N.E. 211, 213 (N.Y. 1917)).

The main questions that the Court must address at this point are whether, as a matter of law, Ruehl has established that AM General waived the marking requirement by manifesting the unequivocal intent to do so, or created a genuine issue of material fact regarding waiver? If the answer to either of these questions is yes, then AM General's summary judgment motion must also be denied on this basis. Ruehl argues both of these points. Pls.' Am. Suppl. Brief in Opp'n

Def.'s Second Mot. Part. Summ. J. at 4, ECF No. 110. AM General responds that Ruehl's waiver argument "fails at the threshold and summary judgment in favor of [AM General] is appropriate." ECF No. 112 at 9.

Ruehl focuses on conduct surrounding the transmission of documents, specifically of technical documents which were not marked with either the words "confidential" or "proprietary" that AM General shared with Ruehl during the development of the "idea." ECF No. 87 at 15–17. This conduct arguably could manifest an intent to waive the marking requirement of the MCA if AM General shared documents with Ruehl that that were not marked as confidential or proprietary but that AM General still considered to be covered by the MCA. And that appears to be what happened between the parties.

The Federal Rules of Civil Procedure allow a party, during discovery, to serve a notice or subpoena on a "public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). The receiving organization "must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf." *Id.*; *see also Sanyo Laser Prods. Inc. v. Arista Records, Inc.*, 214 F.R.D. 496, 502 (S.D. Ind. 2003) ("'Since it is not literally possible to depose a corporation,'" Rule 30(b)(6) authorizes litigants to name a business entity as a deponent." (quoting *Crous Cartage Co. v. Nat'l Warehouse Inv. Co.*, No. IP02-071, 2003 WL 118001, *1 (S.D. Ind. Jan 13, 2003))).

Mr. Regis Luther, the representative AM General designated under this rule, testified under oath by affirmation that AM General considered "all of its technical drawings to be confidential" and that "if AM General shares its confidential information with a third party, it expects that third party to keep it confidential." Dep. Regis Luther 53:20–53:25, ECF No. 108-2

at 2. Therefore, if AM General transmitted documents to Ruehl that were not marked as confidential or proprietary but that it still considered to be covered by the MCA, then AM General could have waived the marking requirement of the MCA.[11]

The next question before the Court then is whether AM General transmitted to Ruehl, or shared with Ruehl, technical documents (which according to Mr. Luther it considered confidential) which were not marked as confidential or proprietary. There are several categories of relevant documents: "the large-scale" drawing; AMG 677–81; AMG 392 and 440; three sets of technical documents which AM General emailed to Ruehl; two computer-generated drawings; an unspecified number of documents which Ruehl had access to during the project within AM General's internal databases; and finally assorted technical documents that were not marked as "confidential" or "proprietary" that were shared with third parties. Furthermore, there is also deposition testimony about a conversation that allegedly took place between Ruehl and Pionke, which Ruehl claims is relevant to his argument that AM General waived the marking requirement of the MCA.

The Court will first lay out what the evidence shows about each of these categories, and then analyze the legal implications of each. For each, the Court will analyze whether there are genuine issues of material fact about each document or documents, and then will make a global determination on what the parties have established about AM General's intent as manifested through conduct during the relevant period.

    a.       Categories of Evidence

---

[11] AM General attempts to avoid the effect of Mr. Luther's deposition testimony by arguing that Mr. Luther testified that the documents were considered "confidential" and *not* "confidential under the MCA." ECF No. 112 at 15. But while AM General's counsel noted that distinction at the time of the deposition [ECF No. 112-2 at 4], Mr. Luther never made that distinction in his testimony. And given that at this stage the Court must interpret the facts in the light most favorable to the non-moving party, the Court concludes that it must interpret Mr. Luther's testimony as a statement that at least allows for the possibility that AM General considered the documents to be covered by a relevant MCA. At trial this would of course be a contested issue of fact.

i.    *Large-Scale Drawing*

The first document at issue is referred to by the parties as the "large-scale drawing,"

hereinafter referred to as the "LSD." The LSD is a copy of a "very large mechanical drawing of a

Humvee frame rail" that AM General sent to Ruehl in February of 2005. ECF No. 110 at 9.

Ruehl testified, and AM General does not directly dispute, that the original LSD sent to Ruehl

was lost. Def.'s Resp. Pls.'s First Set Post-Stay Disc. Reqs. at 3–4, ECF No. 92-3. It is therefore

unknown whether the original LSD sent to Ruehl had any sort of markings that could be

considered "confidential" or "proprietary," and the parties dispute this question of fact. *Id.*

There is conflicting evidence on this point. First, John Smreker, another 30(b)(6)

representative for AM General, testified that: he did not know if the LSD was marked as

confidential; he did not know if AM General or a third party produced the copy; and if AM

General produced the copy "[s]omeone would have to physically stamp it" as confidential.

Smreker Dep. 169:1, ECF No. 87-3 at 4. To contrast, AM General, in an interrogatory answer,

submitted that "it was [AM General's] practice at the time to mark such large scale documents

confidential or proprietary before they were sent to third parties." ECF No. 92-3 at 4. The answer

continued by submitting that when AM General produced the new copy of the LSD that was

disclosed to Ruehl during discover in this case, it "reprinted the drawing directly from its system

in the same manner that the drawing would have been printed and sent to Ruehl in 2005. AM

General's CAD system automatically prints the proprietary legend on that drawing, just as it

would have done in 2005." *Id.*

Obviously it cannot be the case that AM General both did and did not print the original,

and that if AM General did print the original LSD then it both did and did not need to be

manually marked as confidential or proprietary before it was sent out. Further, even if the

original copy of the LSD had not been automatically marked and did need to be manually stamped as confidential or proprietary, it still might have been.

In the course of discovery in this case, AM General did produce a new copy of the LSD, and it is undisputed that the newly made copy is marked "confidential." Pls.' Notice Filing Am. Suppl. Brief Opp'n Def.'s Second Mot. Part. Summ. J. Correct Inadvertent Error Re. Identification Ex. at 1, ECF No. 109. This seems to have created an issue which confused the parties during briefing on this matter. What happened is as follows. First, AM General disclosed a new copy of the LSD to Ruehl, and Ruehl represented to the Court that this copy was not marked as confidential or proprietary. Pls.' Suppl. Brief in Opp'n Def.'s Second Mot. Part. Summ. J. at 10, ECF No. 107. AM General's counsel reached out to Ruehl's counsel to discuss the matter, and Ruehl filed a notice with the Court conceding that the copy of the LSD produced during discovery actually was marked as confidential or proprietary. ECF No. 109 at 1. AM General, in its final brief [ECF No. 112 at 14], misconstrues this concession. AM General appears to argue that Ruehl's concession was regarding the original copy of the LSD that he received in 2005, and not the copy that he received during discovery in this matter. *See* ECF No. 112 at 14. And viewing both Ruehl's notice of correction [ECF No. 109 at 1] and amended memorandum reflecting the concession [ECF No. 110 at 9–10], it is clear that Ruehl was only conceding that the newly produced copy, and not the original copy of the LSD, was marked as proprietary.

  ii.  *AMG 677–81*

The second category is a series of documents, labeled AMG 677–81, that was sent to Ruehl by Pionke on February 17, 2005. AMG 677 is an email discussing payment and other terms of the proposed agreement between the parties and is not marked "confidential" or

"proprietary;" and the remainder of the documents in the bates range were attachments to that email. AMG 677–81, ECF No. 93-1 at 1–5. AMG 678–81 are technical drawings of AM General's rail designs. *Id.* at 2–5. Of these, only AMG 678 is marked with the words "PROPRIETARY DATA." *Id.* at 2. The other technical documents, AMG 679–81, are not marked with the words "confidential" or "proprietary." *Id.* at 3–5.

iii.    *AMG 440 and 392*

The next documents are labeled as AMG 440 and AMG 392. AMG 440 is a document entitled "Design Verification Plan & Report," sent to Ruehl July 7, 2005. Ex. B to Second Decl. of Meghan Hodge, ECF No. 93-2. The parties agree that the phrase "AM General Confidential" is electronically embedded in the document. Ex. C to Decl. Meghan Hodge at ¶ 5(b), ECF No. 87-8, ECF 110 at 8. They also agree that, in order to see this phrase, the document either has to be printed or the user has to "turn on" the marking electronically. ECF 110 at 8. The parties dispute whether the electronically embedded words are sufficient for the document to be "marked" under the MCA.

AMG 392 is also titled "Design Verification Plan & Report," and was sent from AM General to Ruehl on July 7, 2005. Ex. C to Decl. of Meghan Hodge, ECF No. 87-11. It contains some of the same information, including a table labeled "Test Description" that appears to be identical on both documents. *Id.* AM General, in an answer to one of Ruehl's interrogatories, specifically identified the "Test Description" table in AMG440 as containing "Confidential Information" pursuant to the MCA, even though the same identical table appeared in AMG 392, a document that both parties agree was unmarked with either of the terms "confidential" or "proprietary." Def.'s Resp. Obj. Pls.' First Set Interim Disc. Req. at 5, ECF No. 107-2.

iv.    *Supplementary Documents*

37

The next category of documents consists of three sets of technical drawings (together the "Supplementary Documents") that AM General emailed to Ruehl on February 17, April 20, and May 9, all of 2005. ECF No. 108-3, 108-4, 108-5. The first set, sent to Ruehl on February 17, 2005, consists of an email message forwarding three technical drawings to assist Ruehl in his consulting role. ECF No. 108-3. They were sent on the same day that AMG 677-81 were sent to Ruehl. The second set was sent on April 20, 2005, and consists of an email message with a meeting agenda and a technical drawing attached. ECF No. 108-4 The third and final set in this category was sent on May 9, 2005, and consists of an email and 20 attached technical drawings. It appears to be undisputed that none of these technical drawings was marked "confidential" or "proprietary" until they were marked as such for discovery in this case. *Compare* ECF No. 110 at 10 (asserting the documents were not marked), *with* ECF No. 112 (not contesting this argument).

v. *Computer-Generated Drawings*

The next category consists of two computer-generated technical drawings of a frame rail ("CG Drawings"). ECF Nos. 108-45, 108-46. While Ruehl claims that these documents are not labeled "confidential" or "proprietary" [ECF No. 110 at 11], the Court is unable to make out sufficient detail on these drawings to determine whether or not they have such markings. At the same time, AM General does not contest that these documents are not so marked. ECF No. 112.

Mr. Luther, another of AM General's Rule 30(b)(6) witnesses, testified that it was "likely" that these two drawings were created by AM General, but that he could not say for sure. Dep. Regis Luther 125:22, ECF No. 108-2 at 3. Furthermore, it is important that there is no evidence in the record at this point that these documents were transmitted to Ruehl before this case commenced, much less during the relevant time period.

vi. *Documents Sent to Third Parties*

Next, Ruehl has obtained through discovery a number of technical documents that were not marked as "confidential" or "proprietary" that AM General transmitted to third parties. Specifically, between March 7, 2005, and November 9, 2006, AM General sent Applied Technologies, Inc. ("ATI") five emails and one fax message, with numerous technical drawings attached. ECF No. 108-6 to ECF No. 108-11. Also on March 7, 2005, ATI and AM General signed a mutual confidentiality agreement. ECF No. 108-40. The provision in this agreement titled "Confidential Information" is, to a word, identical to the provision titled "Confidential Information" in the MCA entered into by Ruehl and AM General. *Compare* ECF 22-1 at 1, *with* Mutual Confidentiality Agreement at 1, ECF No. 108-40.

AM General also sent attached unmarked technical documents to Assured Design, Inc. ("ADI") a total of twenty-eight times between May 20, 2005, and November 26, 2006 [ECF Nos. 108-13 to 108-39]. Just like with ATI, AM General had a mutual confidentiality agreement with ADI [ECF No. 107-3], containing a provision titled "Confidential Information" that is functionally identical to the provision titled "Confidential Information" in the MCA entered into by Ruehl and AM General.[12]

Finally, AM General also sent unmarked technical documents to other third parties on five other occasions presented to the Court [ECF Nos. 108-39, 108-41 to ECF No. 108-44]. At this point there is no evidence that AM General had any sort of confidentiality agreements with the other parties that these documents were sent to.

---

[12] The only difference between the "Confidential Information" sections in the MCA [ECF No. 22-1] and the mutual confidentiality agreement signed by AM General and ADI is in the last sentences of the provisions. The last sentence in the MCA reads, "Any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to *Commercial/Military Vehicle Frame Feasibility Study*." ECF No. 22-1 at 1 (emphasis added). The last sentence in the "Confidential Information" provision in the mutual confidentially agreement signed by AM General and ADI reads, "Any information that has value to the Disclosing Party and is not generally known to its competitors, including but not limited to *HMMWV and Commercial Vehicle Three-Piece Frame Rails*." Mutual Confidentiality Agreement at 1, ECF No. 107-3 (emphasis added).

### vii.   *Documents on AM General's Internal Databases*

Next is an unknown number of technical documents that Ruehl had access to internally within AM General that may or may not have been marked. ECF No. 92-3 at 3. AM General declared in a response to an interrogatory asking it to identify "each particular item of [AM General] Confidential Information" that "Ruehl had direct access to [AM General] Confidential Information through various computer workstations and AM General's CAD systems." ECF No. 92-3 at 3. And further, that "[i]t is impossible at this time to identify each and every such drawing Ruehl viewed or accessed during these meetings." *Id.* This means that there is an unknown number of technical documents that Ruehl viewed that may or may not have been marked as "confidential" or "proprietary."

### viii.   *Ruehl and Pionke Conversation*

Finally, there is a relevant interaction that occurred between Ruehl and Pionke on March 7, 2005. Ruehl contends that, after he showed the March 5, 2005 drawing to Pionke, Ruehl noted that his "idea" "may be original; I would like a patent search conducted." Dep. Phillip Ruehl at 50, ECF No. 55-1. He testified that Pionke "said you're going to sign a document that will protect any ideas, and we can think about any patent search later." *Id.* at 51. Pionke "then produced the MCA" and he and Ruehl signed it. *Id.* Pionke, on the other hand, testified that he did not know when he first discussed the potential of a patent with Ruehl, that it "probably" happened sometime in March 2005, and that Ruehl "probably thought [getting a patent] would be a good idea" but that Pionke couldn't "remember what he said in specific." Dep. Ralf Pionke at 175–77, ECF No. 56-2.

### b.   Analysis of Evidence Submitted on Waiver

As an initial matter, it is worth reiterating that whether unmarked technical documents were transmitted from AM General to Ruehl is relevant because AM General considered "all of its technical drawings to be confidential." Dep. Regis Luther 53:20–53:25, ECF No. 108-2 at 2. Therefore, if unmarked technical drawings were transmitted from AM General to Ruehl during the relevant period, a jury could find that conduct manifested an intent to waive the marking requirement of the MCA.

AM General argues that the transmission of unmarked technical documents is irrelevant to the issue of waiver of the marking requirement of the MCA because "the Court has already held that a document *must* be so marked to be covered" by the MCA. ECF No. 112 at 13. But that is not what the Court held. The Court previously interpreted the language of the MCA and held that within the four corners of the MCA, the language of that document required that technical documents must be marked to qualify as "Confidential Information" and receive the contemplated protections. ECF No. 69 at 21–22. Whether or not AM General waived the marking requirement of the MCA through conduct manifesting an intent to waive that requirement is not a question that the Court has previously addressed. *See generally id*.

        i.     *Large-Scale Drawing*

Whether the original copy of the LSD sent to Ruehl was marked with the words "confidential" or "proprietary" is a contested issue of fact. Ruehl's position is that the LSD was not marked "confidential" or "proprietary," while AM General's position is that it was. As mentioned above, AM General claims that the original was absolutely marked as such, because "AM General's CAD system automatically prints the proprietary legend on that drawing, just as it would have done in 2005." ECF No. 92-3 at 4. But there has also been deposition testimony submitted that in 2005 AM General's system would not automatically print the "proprietary

legend" on technical documents it created, and that Smreker did not remember whether AM General manually stamped the LSD or not. Smreker Dep. 167:21–167:25, ECF No. 87-3 at 4. This is conflicting evidence, and it is not the role of the Court at summary judgment to weigh evidence and resolve conflicting evidence. *Anderson*, 477 U.S. at 249.

Ruehl also submitted numerous technical documents to the Court, laid out above, that AM General either sent to him or to a third party during the relevant time period that were not marked with either the terms "confidential" or "proprietary." This cuts strongly against AM General's claim that its system during the relevant period automatically added a footer to technical documents labeling them "confidential" or "proprietary." Specifically, AM General stated in an interrogatory response that it had provided him with physical copies of AMG 677–81, of which AMG 678–81 were technical documents. But, of that range of technical documents, only AMG 678 was marked as "proprietary." Further, the CG Drawings, Supplemental Documents, AMG 392, and numerous documents sent to third parties all were unmarked with either the term "confidential" or "proprietary." If AM General's system automatically marked technical documents as "confidential" or "proprietary" then AMG 679–81, as well as the rest of the unmarked technical documents specified above, should have been automatically marked too.

And whether or not the LSD was marked as "confidential" or "proprietary" is material because, if it was not marked as such, then its transmission to Ruehl could be considered to have been a manifestation of intent to waive the marking requirement entirely. This contested fact is extremely important to determining the ultimate issue of fact on the issue of waiver, i.e. whether or not AM General manifested intent to waive the marking requirement of the MCA. This is especially so because AM General still takes the legal position that the LSD was covered by the MCA. ECF No. 112 at 4.

ii. *AMG 677–81*

A jury could also find that the transmission of AMG 679–81 manifested intent by AM General to waive the marking requirement of the MCA. As noted, AMG 679–81 are unmarked technical documents that AM General sent to Ruehl during the relevant time period. AM General stated in an interrogatory answer that AMG 677–81 were "marked as proprietary or confidential." ECF No. 92-3 at 3. This is contradicted by AM General's later brief in this matter stating that the answer only was intended to refer to AMG 678 and that the range it listed was "to show the transmission email to Ruehl and all of its attachments." ECF No. 95 at 4 n.1.[13] But that is not what AM General actually submitted in its interrogatory response. The response states that AM General "provided Ruehl physical copies of drawings that were marked proprietary or confidential. These documents have previously been produced as AMG677-681 and AMG440." ECF No. 92-3 at 3.

AM General argues that, of this cited range, it is only using AMG 678 as part of the basis for its counterclaim and so the transmission of these other documents is not relevant. ECF No. 95 at 4 n.1. But the fact that AM General argues that AMG 679–81 are not part of the basis for their counterclaim is what is actually irrelevant. AM General may be taking the legal position that AMG 679–81 are not "marked" and thus not covered by the MCA, but Mr. Luther, one of AM General's Rule 30(b)(6) corporate witnesses, testified that all technical documents were confidential. Dep. Regis Luther 53:20–53:25, ECF No. 108-2 at 2. AMG 679–81 are technical documents and would therefore fall under that umbrella. Thus, the fact that AM General sent

---

[13] It also does not appear that AM General is arguing that the mark on AMG 678 is sufficient to cover the other attached technical documents.

these admittedly unmarked technical documents to Ruehl could be found by a jury to have manifested intent by AM General to waive the marking requirement.[14]

### iii. *AMG 440 and 392*

AMG 392 is also relevant, as an unmarked technical document sent to Ruehl, as to whether AM General manifested an intent to waive the marking requirement. But the document is also relevant for a different reason. It contains a table entitled "Test Description" which is identical to the table entitled "Test Description" in AMG 440. *Compare* ECF No. 87-11, *with* ECF No. 107-2 at 5.

AMG 440 also contains a "hidden" footer which contains the term "proprietary." ECF No. 107-2 at 5. This footer is only viewable electronically if the viewing party affirmatively "turns on" the footer, which Ruhl alleges he never did and was never instructed to do. Allegedly the footer also appears if the document is printed. The parties dispute whether AMG 440 was "marked" within the meaning of the MCA because of the "hidden" footer and because the "Test Description" table was in both AMG 392 and in AMG 440.

The parties misconstrue the relevance of these documents. What is relevant at this stage is not whether AMG 440 was "marked" within the meaning of the MCA.[15] The relevant question

---

[14] Curiously, neither party addresses the issue that both the LSD and AMG 677–81 were transmitted to Ruehl by AM General in February of 2005, while the MCA was not signed by each party until March 7, 2005. And while the Court is not reaching the issue because the parties did not raise it, the MCA appears to not apply to information or documents exchanged before the agreement was signed. *See* ECF No. 22-1 at 1. If that is true, then whether any of these documents is "marked" under the MCA would be irrelevant because waiver is the voluntary relinquishment of a known right. *Tate*, 587 N.E.2d at 671. And a right cannot be "known" if it does not yet exist. However, while the transmission of these documents could not claim any protection under the MCA under any interpretation of the "marking" requirement due to the fact that they were disclosed before the parties signed the MCA, the parties both argue that the LSD and AMG 678 are part of the grounds for the counterclaim and, therefore, are covered by the MCA. And it is not this Court's role to make arguments for the parties where they did not do so. *Keller v. United States*, 58 F.3d 1194, 1198–99 (7th Cir. 1995) ("[I]t is not the responsibility of this court to make arguments for the litigants.").

[15] That determination would, of course, be relevant to the disposition of AM General's counterclaim.

surrounding AMG 440 is whether its transmission with the embedded "confidential" mark, which Ruehl alleges he never viewed during the relevant time period and was never told that he needed to "turn on," manifested an intent to waive the marking requirement because it was essentially hidden from the viewer. What intent was manifested from the transmission of AMG 440 is a contested issue of fact that the Court cannot resolve at the summary judgment stage. *See Anderson*, 477 U.S. at 249.[16]

        iv.      *Supplementary Documents*

AM General argues that the Supplementary Documents are not relevant because it is not arguing that these documents are part of the basis for the counterclaim. But like AMG 679–81, these are technical documents that were transmitted to Ruehl during the relevant period. Similarly, based on Luther's testimony in his capacity as a Rule 30(b)(6) deposition witness for AM General, a jury could find that the transmission of these technical drawings, which AM General expected Ruehl to keep confidential but did not mark as such, could have manifested an intent to waive the marking requirement of the MCA.

        v.      *Computer-Generated Drawings*

The CG Drawings were not transmitted to Ruehl, and so cannot directly inform the question of whether AM General manifested intent to waive. However, they are relevant. That AM General did not automatically mark these documents with either of the terms "confidential" or "proprietary," during the relevant period is evidence of whether it was AM General's practice to automatically mark other, directly relevant documents that were created around the same time, such as the LSD and the unknown internal documents which Ruehl accessed.

        vi.      *Documents Sent to Third Parties*

---

[16] The Court will therefore not reach the questions surrounding the transmission of the sensitive information that is duplicated in both AMG 392 and AMG 440.

The technical documents sent to ADI and ATI were never sent to Ruehl during the relevant period. This presents the question of whether conduct by one party to a contract can manifest an intent to waive a contractual right when the other party to the contract has no knowledge of that conduct? The parties have both done a poor job in arguing this point to the Court, but the answer appears to be no.

"A person who is in a position to assert a right or insist upon an advantage may by his own words or conduct . . . waive such right." *Lafayette Car Wash, Inc.*, 282 N.E.2d at 839. Because waiver can only be accomplished by a "person who is in a position to assert a right" common sense dictates that conduct allegedly manifesting an intent to waive a contractual provision must be manifested to another party to the contract against whom the allegedly waiving party had the ability to assert the right. *See id.* Therefore, the Court concludes that the unmarked technical documents sent to ADI and ATI, as well as the other third parties [ECF Nos. 108-39, 108-41 to 108-44], during the relevant periods cannot manifest an intention to waive the marking requirement of the MCA.

That is not the end of the story though. Like the CG Drawings, these technical documents were transmitted and/or created around the relevant time period, and it is undisputed that they are not marked with either of the words "confidential" or "proprietary." Thus, while these documents do not directly inform the Court's analysis of AM General's manifested intent, they are relevant to the inquiry of whether other documents, such as the LSD and the unknown documents that Ruehl accessed in AM General's internal database, were automatically marked as "confidential" or "proprietary."

vii. *Documents on AM General's Internal Databases*

Finally, walking through the analysis step by step reveals that there is another issue of fact regarding the internal documents that Ruehl had access to within AM General's databases when he was working on the project. In federal summary judgment proceedings, the party moving for summary judgment does not have to offer evidence to disprove an element of the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 323. The moving party's burden can be met by showing the absence of evidence, by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* (emphasis added). The Supreme Court then held that there is no requirement that the moving party "support its motion with . . . materials negating the opponent's claim." *Id.*

Here, AM General has the burden to show that there is no genuine dispute that the unknown internal documents were marked, *Celotex Corp.*, 477 U.S. at 323, which it met by submitting deposition testimony that its systems automatically marked technical documents as either "confidential" or "proprietary." ECF No. 92-3 at 4. The burden then shifts to Ruehl to "come forward with specific facts showing that there is a genuine issue for trial." *Spierer*, 798 F.3d at 507. Ruehl met this burden by producing all of the above-referenced unmarked technical documents that AM General either created, transmitted to Ruehl, or transmitted to third parties.

However, while these unmarked technical documents are indirect evidence that these internal documents may have not been marked as "proprietary" or "confidential," that is not sufficient to support Ruehl's argument of waiver by conduct. For a finder of fact to credit Ruehl accessing unmarked documents as evidence of waiver, there would have to be evidence of that actually occurring. At this stage, while Ruehl has provided enough evidence to reject AM

General's argument that it marked those documents "automatically,"[17] there is no evidence in the record that Ruehl actually viewed unmarked documents in AM General's databases. Therefore, whether the documents that Ruehl viewed within AM General's databases were marked or not is an issue of fact going to the question of whether AM General's conduct manifested an intent to waive the marking requirement.

        viii.    *Ruehl and Pionke Conversation*

Finally, as to the conversation that Ruehl had with Pionke, Ruehl argues that this exchange is damning because, "there is no evidence in the record to suggest that Pionke insisted that Ruehl add some marking to his documents to protect his interests." ECF No. 87 at 14. This argument is without legal support. Aside from the fact that the statement was contemporaneous to the signing of the MCA, Ruehl has presented no authority even suggesting that Pionke was under any sort of obligation to remind Ruehl of the marking requirement of the MCA. And in fact, contrary authority exists in Indiana caselaw because "waiver is an affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act." *Pohle*, 724 N.E.2d at 659.

Further, at this point it is unclear what actually took place during the discussions between Ruehl and Pionke, because Pionke testified that he remembered very little of the interactions Ruehl claimed took place. Therefore, there may also be issues of fact and credibility determinations that a jury would need to resolve about the conversations. Therefore, there has been insufficient evidence submitted to the Court at this stage to conclude that the conversations support Ruehl's argument of waiver.

        c.    Intent Analysis

---

[17] This is so at least at the summary judgment stage where the Court is obliged to construe all facts in the light most favorable to Ruehl, as the nonmoving party.

This all boils down to the three questions laid out above: 1) has Ruehl established as a matter of law that AM General waived the marking requirement of the MCA by conduct; 2) has AM General established as a matter of law that it did not waive the marking requirement; 3) and if the answer is no to both of those, is there a genuine issue of material fact regarding the issue of waiver? Ruehl's argument is that the unmarked technical documents that AM General sent him undisputedly manifested an intent to waive the marking requirement of the MCA. ECF No. 110 at 4–11. AM General argues that Ruehl has not established that it intended to waive the marking requirement of the MCA and that there is no genuine issue of material fact on the issue of waiver. ECF No. 112 at 8.

First, did AM General's conduct manifest an intent to waive the marking requirement as a matter of law?[18] Ruehl argues that the answer is yes because of the unmarked technical documents AM General transmitted to him. ECF No. 110 at 4. This is incorrect. For waiver by conduct to be established as a manner of law, the conduct must be "so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary." *Terry*, 554 F. Supp. at 1095. And here, while AM General did transmit technical documents to Ruehl that arguably could have manifested an intent to waive the marking requirement, it is also undisputed that AM General transmitted documents that were marked with either of the words "confidential" or "proprietary."

The transmission of the documents marked as such is conduct that is contrary to the intent to waive the marking requirement. A jury could reasonably find that AM General's conduct in transmitting both marked and unmarked technical documents to Ruehl was not evidence of intent to waive the marking requirement but was simply negligence on the part of

---

[18] As the party asserting waiver of a right, Ruehl bears the burden of proof on the issue. *Union Fed. Sav. Bank*, 582 N.E.2d at 431.

AM General in protecting documents that it considered important. *See Hastetter*, 873 N.E.2d at 684 ("[S]ilence, inactivity, or acquiescence is not waiver unless the party against whom waiver is claimed had a duty to act or speak."). Therefore, the Court concludes that Ruehl has failed to establish that AM General waived the marking requirement of the MCA as a matter of law.

AM General has also failed to establish that it did not waive the marking requirement by its conduct as a matter of law. AM General argues that the deposition testimony by Luther as its Rule 30(b)(6) witness regarding "confidential information" absolutely does not apply to MCA and that this testimony referred to what AM General considered "confidential in the general sense." ECF No. 112 at 14. But Luther testified that AM General considers all of its technical documents to be "confidential information," which a jury could find meant that AM General considered these documents to be covered by the various mutual confidentiality agreements that it had with outside professionals that it engaged.[19] And there is no contrary evidence in the record supporting an alternate source of authority that AM General could rely on to protect these technical documents other than the mutual confidentiality agreements it had with various outside parties, such as the one it had with Ruehl. Therefore, a reasonable fact finder could conclude that Luther's testimony did refer to MCA. Further, while AM General argues that the testimony did not refer to MCA, it has not even alleged any other source of authority under which it could have claimed legal protections for these valuable technical documents.[20] And while AM General does

---

[19] The fact that AM General had at least three functionally identical mutual confidentiality agreements with Ruehl, ADI, and ATI around the same time would support this contention.

[20] Black's legal dictionary defines "confidential" as, "1. (Of information) meant to be kept secret; imparted in confidence <confidential settlement terms>. 2. (Of a relationship) based on or characterized by trust and a willingness to impart secrets to the other <a confidential relationship between attorney and client>." *Confidential*, Black's Law Dictionary (11th ed. 2019). It is hard to imagine that a sophisticated corporation such as AM General would genuinely intend that when it referred to "confidential information" that it would mean information that was "confidential in the general sense (*i.e.*, information it prefers not to publicize)," as AM General now claims, and not information that AM General had some form of actual legal protection over.

not present it as such, AM General is essentially contesting whether its actions through its employees manifested an intent to waive the marking requirement. ECF No. 112 at 8. Therefore, AM General has failed to establish that it did not waive the marking requirement of the MCA as a matter of law.

As to the third question, while AM General argues that it "did not, for the purposes of its summary judgment motion, dispute any of the facts alleged by Ruehl," this is simply not the case. AM General argues emphatically that it never intended to waive the marking requirement, and that its conduct through its agents and employees reflected that lack of intent. ECF No. 112 at 8. As mentioned above, Ruehl contests this fact and has supported this argument with technical documents AM General transmitted to him that were not marked as "confidential" or "proprietary," but that AM General still considered to be confidential.

And the Court's determination of waiver turns on whether or not AM General's conduct manifested intent to waive the marking requirement of the MCA, making this factual dispute material. *See Terry*, 554 F. Supp. at 1095. There is evidence that could support a finding that AM General's conduct manifested an intent to waive, in the form of Luther's deposition testimony and the transmission of unmarked technical documents. There is also evidence to support the opposite because there were both marked and unmarked documents transmitted, allowing for a potential finding that the lack of any marking was inadvertent. Thus, AM General's intent as manifested through its conduct is a genuine issue of material fact. ECF Nos. 112 at 8, 110 at 6–14.

A genuine issue of material fact precludes this Court from granting summary judgment. Fed. R. Civ. P. 56; *see also Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."). Therefore, the genuine issue of material fact regarding AM General's intent as manifested through conduct requires the Court to deny AM General's Motion for Partial Summary Judgement on a ground that is entirely independent of the Court's above conclusion that Ruehl's signature could fulfill the marking requirement of the MCA.

### 3.    *Supplemental Interrogatory*

Ruehl makes two arguments regarding AM General's answer to an interrogatory about what AM General considered "Confidential Information." ECF No. 92-1 at 2–5. Ruehl's argument as to the effect of the interrogatory and related answer is unclear, but he does claim that "[t]he significance of this response cannot be overstated." *Id.* at 2.

Ruehl explains that he "served an interrogatory asking AM General to specifically identify and describe each particular item of alleged 'Confidential Information' underlying its counterclaim." *Id.* AM General responded that it "provided Ruehl physical copies of drawings that were marked proprietary or confidential.  These documents have previously been produced as AMG677-681 and AMG440." ECF No. 92-3 at 3–4.[21]

---

[21] The full text of the question and answer are as follows:

1.  Specifically identify and describe each particular item of AMG Confidential Information. If the particular item of AMG Confidential Information was provided or transmitted to Plaintiffs in document form, also identify the Bates number(s). If the particular item of AMG Confidential Information was orally provided or transmitted to Plaintiffs, also identify the Bates number(s) of the written notice by which AM General subsequently informed Plaintiffs of the information's confidential or proprietary nature. If the particular item of [AM General] Confidential Information was provided or transmitted to Plaintiffs in some other manner, specifically identify and describe how the information was provided or transmitted to Plaintiffs.

RESPONSE: AM General objects to this Interrogatory as overly broad and unduly burdensome. Given the nature of the relationship between Ruehl and AM General, it is not reasonably practical to identify each and every piece of Confidential Information Ruehl was provided or had access to during his involvement with the frame rail project. Indeed, Ruehl had direct access to [AM General] Confidential Information through various computer workstations and AM General's CAD systems. It is impossible at this time to identify each and every such drawing Ruehl viewed or accessed during these meetings. Without waiving this Objection, and in addition to providing Ruehl access to its CAD system which contained drawings marked proprietary or confidential, AM General also provided Ruehl physical copies of drawings that were marked proprietary or confidential. These documents have previously been produced as AMG677-681and AMG440. Moreover, in February 2005, AM

Ruehl first argues that the interrogatory answer is evidence of waiver. ECF No. 92-1 at 5. To the extent that the interrogatory response is relevant to the waiver analysis, it has been addressed above.

Ruehl also argues that AM General's interrogatory response is an admission that it considered AMG 677, 79–81 to be covered by the MCA even though they are not marked. ECF No. 92-1 at 2. But that is not what the response actually says. The response states: "AM General also provided Ruehl physical copies of drawings that were marked proprietary or confidential. These documents have previously been produced as AMG677-681and AMG440." ECF No. 92-3 at 3-4. While the response does identify AMG 677–81 as being "marked proprietary or confidential," it does not state that the MCA applies to these unmarked documents, and, in fact, the MCA is not referenced at all. *Id.* If the answer to the interrogatory is not related to the counterclaim (as it appears not to be) then it is on its face unrelated to the MCA, because both the interrogatory and answer ask about "Confidential Information" but do not specifically refer to the MCA. ECF No. 92-3 at 3–4. It is worth noting that both parties state in their briefs that the interrogatory is related to the counterclaim, but that is not what the actual evidence submitted to the Court shows. And arguments are not evidence. *See* Fed. R. Civ. P. 56 (c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").

---

General mailed a large-scale drawing to Ruehl for review. Although Ruehl testified that he no longer has the original drawing, AMG's representative testified that it was [AM General's] practice at the time to mark such large scale documents confidential or proprietary before they were sent to third parties. During discovery in this case, AM General reprinted the drawing directly from its systemin the same manner that the drawing would have been printed and sent to Ruehl in 2005. AM General's CAD system automatically prints the proprietary legend on that drawing, just as it would have done in 2005.

ECF No. 92-3 at 3–4.

Here, there is no evidence that the interrogatory and response relate to "Confidential Information" that is the basis for AM General's counterclaim, which would have implied that the documents named would be confidential under the MCA. This is because neither the text of the interrogatory or of the answer explicitly refer to either the counterclaim or the MCA. Instead they both simply refer to "Confidential Information." There may be a preamble to the interrogatory that specifically defined "Confidential Information" as meaning confidential under the MCA, but neither party has provided the Court with the original interrogatory served by Ruehl. Therefore, it is unclear to the Court what legal effect either party expects this interrogatory and response to have on the instant question before the Court. Additionally, neither party has presented the Court with any legal authority clarifying what effect the interrogatory and response could or should have on AM General's motion.

Because neither party has presented a cogent argument explaining the effect of the interrogatory and related response and there are other genuine issues of material fact requiring the Court to deny AM General's motion, the Court declines to reach a legal conclusion regarding this issue.

### 4.     *Counterclaim as Judicial Admission*

Ruehl further argues that AM General's counterclaim is effectively a judicial admission that Ruehl's invention is protected by the MCA. ECF No. 110 at 6. AM General argues that its counterclaim cannot constitute a judicial admission because it is not a statement of fact but is instead a legal argument. ECF No. 112 at 10–11.

The parties dispute the meaning of paragraph 36 of AM General's counterclaim. This section comes under the heading "Count II: Breach of Contract." Def.'s Answer Aff. Defenses Pls.' Am. Compl. Countercl. at p. 22, ECF No. 25. Paragraph 36 of the counterclaim provides:

"[Ruehl] further breached the Confidentiality Agreement by filing a patent application containing confidential information that belonged to AM General . . . ." *Id.*

Ruehl has a point. Within the context of Ruehl's Amended Complaint, AM General is defending on the basis that the MCA does not apply to the "idea," such that paragraph nine of the purchase order applies and Ruehl has no rights to the "idea." AM General is also arguing that, "the MCA by its very terms does not apply because Ruehl did not mark the information he submitted to [AM General] as confidential or proprietary." ECF No. 90 at 4.

But in its counterclaim, AM General alleges that Ruehl "breached the [MCA]" by filing for a patent on his "idea" that is at the heart of this case. EFC Nos. 25 at 22, 67 at 7. For Ruehl to have breached the MCA by using information about his invention, his invention must necessarily have been covered by the MCA.[22] And in its interrogatory answer that AM General argues provides the basis for its counterclaim, AM General only identified the documents mentioned above. There is no evidence that, sometime after March 7, 2005, AMG transmitted to Ruehl some technical document containing the "idea" that was marked "confidential" or "proprietary" such that there would be some other basis for some document containing the "idea" being "marked" such that the invention could be covered by the MCA.

But that does not mean that the counterclaim constitutes a judicial admission. "A judicial admission is a statement, normally in a pleading, that negates a factual claim that the party making the statement might have made or considered making." *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010). "That is why 'in order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous.'" *Id.* (quoting *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997)). "A party may state as

---

[22] AM General tries to get around this point by arguing that the counterclaim only alleges a breach of the MCA "by disclosing [AM General's] *undefined confidential information.*" ECF No. 112 at 11 n.3.

many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Judicial admissions "are not evidence at all but rather have the effect of withdrawing a fact from contention." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) (quoting Michael H. Graham, Federal Practice and Procedure: Evidence § 6726 (Interim Edition)).

Here, the "fact" that Ruehl focuses on is whether the MCA applies to Ruehl's "idea" that is the basis for the protected intellectual property in the '930 patent. But whether a contract, which does not require extrinsic evidence to interpret, applies to undisputed facts is a question of law, not of fact. *See N. Ind. Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 299 (Ind. Ct. App. 1999). Therefore, the statement in AM General's counterclaim cannot constitute a judicial admission because it is not a fact but is a legal conclusion. *See Robinson*, 615 F.3d at 872.[23]

### 5. *Equitable Effect of Counterclaim*

Finally, Ruehl makes an equitable argument regarding AM General's counterclaim. ECF No. 110 at 11–13. He argues that AM General's counterclaim, to be successful, necessarily requires that documents which are not "marked" receive protection under the MCA. AM General argues in response that it is not basing its counterclaim on any documents that are not expressly marked either "confidential" or "proprietary." ECF No. 112 at 11–13.

Under Indiana law, "[a]party may not claim benefits under a transaction or instrument and, at the same time, repudiate its obligations." *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 283 (Ind. 1983) (citing *Caito v. Indianapolis Produce Terminal, Inc.*, 320 N.E.2d 821, 825 (Ind. App. 1974)); *see also Tutor Time Learning Ctrs., LLC v. Larzak, Inc.*, No. 305-

---

[23] The Court declines to rule on the impact of the counterclaim on Ruehl's waiver argument because the Court has already held that there is a genuine issue of material fact preventing the Court from ruling on that issue. But even if the Court were to rule definitively on the matter, it seems clear that, because "a party's pre-litigation failure to assert a legal right is not a judicial admission that the right does not exist," it is also not an unequivocal manifestation of intent to waive that same legal right, or else the result would effectively be the same. *California N. R.R. Co. v. Gunderson Rail Servs., LLC*, 912 F. Supp. 2d 662, 669 (N.D. Ill. 2012).

CV-322 RM, 2007 WL 2025214, at *9 (N.D. Ind. July 6, 2007); *Hickman v. State*, 895 N.E.2d 353, 359 (Ind. Ct. App. 2008), *decision clarified on reh'g*, 900 N.E.2d 825 (Ind. Ct. App. 2009) ("[A]n employee who receives paid vacation time under an employer's policies is estopped from arguing that forfeiture provisions of those same policies are unenforceable."); *Matter of Estate of Palamara*, 513 N.E.2d 1223, 1228 (Ind. Ct. App. 1987). While Ruehl frames this argument as part of his waiver assertion, "The Unmarked Documents Underlying AM General's Counterclaim and Transmitted to Others Support a Finding of Waiver" [ECF No. 110 at 11], the authority which he provides to support this argument does not classify the doctrine as one of waiver but rather equitable estoppel. *See Caito*, 320 N.E.2d at 825 ("An equitable principle also comes into play. Good faith imposed a duty on Caito Foods to speak up and inform Terminal of the wrongful construction. By acquiescing in the violation and accepting the benefits therefrom, there was affirmation of the wrongful construction. Thus, Caito Foods is equitably estopped to assert disapproval and lack of authorization of the prohibited construction."). Therefore, the Court analyzes this argument separately.

Ruehl argues that AM General is attempting to gain the benefit of a narrowly applied marking requirement as applied to the March 5, 2005 drawing (to prevent Ruehl from maintaining rights to the "idea" under the MCA), while simultaneously disclaiming any marking requirement when it comes to any information that it wants protected under the MCA (to be able to sue Ruehl for breaching the MCA when he filed his patent application).

AM General has identified three documents on which its counterclaim is based: AMG 678, AMG440, and the LSD. ECF No. 112 at 12–13. It argues that all three documents are "marked" under the MCA and, therefore, that Ruehl's argument here fails. *Id.* In response, Ruehl argues that all of AMG 677, 679–81 should be considered to be part of the counterclaim based

on AM General's response to the interrogatory.[24] Ruehl also argues that neither the "large-scale drawing" nor AMG440 is "marked" within the meaning of the MCA, and that Ruehl had access over the course of the development of the "idea" to "unspecified CAD drawings." ECF No. 110 at 7. The parties agree that AMG 678 is "marked," but disagree about the other documents.

The most glaring problem with evaluating the parties' arguments is that there exists a genuine issue of fact regarding the LSD. As noted above, the original LSD was lost, and there is a dispute about whether the lost version was marked with either of the words "confidential" or "proprietary." While AM General attempts to distort Ruehl's concession about the reproduced copy that AM General created for the purposes of this litigation being marked, Ruehl clearly still argues that the original document, which is not in evidence, was not marked. ECF No. 110 at 9–10.

But even assuming that neither the LSD nor AMG 440 was "marked," the case law that Ruehl cites does not provide him with any relief. All of the cited cases contemplate situations where a party both attempted to gain the benefit of an agreement and escape its own obligations under that agreement. *See Raymundo*, 449 N.E.2d at 283 (citing *Caito*, 320 N.E.2d at 825); *see also Tutor Time Learning Ctrs., LLC*, 2007 WL 2025214, at *9; *Hickman*, 895 N.E.2d at 359.

For example, in *Raymundo v. Hammond Clinic Ass'n*, Raymundo had entered into a contract with Hammond Clinic Association that: made him a partner in the clinic as an orthopedic physician and surgeon for a period of five years; set forth his compensation schedule; and, in the event of his withdrawal, bound him not to compete with the clinic within its service area for two years. 449 N.E.2d at 277–78. The contract provided for liquidated damages in the

---

[24] As noted above, in response to an interrogatory question asking AM General to designate "Confidential Information," AM General asserted that "AM General also provided Ruehl physical copies of drawings that were marked proprietary or confidential. These documents have previously been produced as AMG677-681 and AMG440." ECF No. 92-3 at 3–4.

amount of $25,000 if he breached the non-compete agreement within the first year of leaving. *Id.*

After two and one-half years of being a partner, Raymundo left the partnership and immediately

began practicing within the clinic's service area. *Id.* The clinic filed suit against Raymundo for

breach of the non-compete agreement. *Id.* Raymundo argued that the non-compete agreement

was unenforceable for several reasons, including that: he entered into the contract under duress;

the non-compete portion of the agreement violated Indiana law and was unenforceable; and there

were genuine issues of material fact regarding the service area. *Id.* at 279–84. The court rejected

all of these arguments and held that, even if Raymundo had entered into the contract under

duress, he accepted the benefits of it for two and one-half years. *Id.* at 283. The court concluded

this issue by stating that, "[a] party may not claim benefits under a transaction or instrument and,

at the same time, repudiate its obligations." *Id.*

Similarly, in *Hickman v. State*, Hickman had been employed by the Indiana Department

for several years and had accumulated 212.5 hours in paid vacation hours. 895 N.E.2d at 354.

Hickman was placed on unpaid suspension and then involuntarily terminated. *Id.* at 354–55.

Under Indiana law, because she was dismissed from her job and did not leave in good standing,

Hickman forfeited all of her accumulated paid sick leave. *Id.* at 355. In relevant part, the court

held that "an employee who receives paid vacation time under an employer's policies is estopped

from arguing that forfeiture provisions of those same policies are unenforceable." *Id.* at 359. The

court further reiterated that in Indiana, "a party may not accept benefits under a transaction or

instrument and at the same time repudiate its obligations." *Id.* (quoting *In re Estate of Palamara*,

513 N.E.2d at 1228).

The facts here are easily distinguishable from these cases. AM General is not disclaiming

an obligation under the MCA through its counterclaim while attempting to benefit from a

different provision in its defense against Ruehl's claims. AM General is advocating for a particular interpretation of the MCA, i.e. that the marking requirement strictly requires documents to be marked "confidential" or "proprietary" to be protected by the MCA. If the Court accepts that interpretation and applies it to the March 5, 2005 technical drawing that Ruehl sent to AM General, then that interpretation will apply with equal force to documents that AM General sent to Ruehl. While AM General's counterclaim based on Ruehl violating the MCA when he filed his patent application might also fail based on this Court accepting AM General's interpretation of the marking requirement of the MCA, that still does not create a situation analogous to those that Ruehl has cited to in these cases. Therefore, the Court concludes that, even if Ruehl is correct and neither AMG 440 nor the LSD were marked under the MCA, Ruehl's argument regarding the equitable effect of the counterclaim fails.

## CONCLUSION

For the reasons stated above, Defendant AM General's Supplemental Motion for Partial Summary Judgment [ECF No. 74] is DENIED.

SO ORDERED on March 25, 2020.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT